**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| **JORGE R. MARTINEZ,** | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | **CASE NO. 5:20-cv-00075** |
| **OFFICER DAVID HINOJOSA,** | § | |
| **INDIVIDUALLY AND IN HIS** | § | |
| **OFFICIAL CAPACITY; AND THE CITY** | § | |
| **OF LAREDO, TEXAS,** | § | |
| *Defendants*. | § | |

**DEFENDANTS' RULE 56 MOTION FOR SUMMARY JUDGMENT AND**
**MOTION FOR JUDGMENT ON THE PLEADINGS UNDER RULE 12(c)**

TO THE HONORABLE DISTRICT COURT:

NOW COMES Defendants the City of Laredo (City), and Officer David Hinojosa (Hinojosa),[1] and files this Rule 56 motion for summary judgment and for a judgment on the pleadings under rule 12(c). Defendants will respectfully show this Honorable Court as follows:

## I. SUMMARY

This is an excessive force case. Plaintiff Jorge R. Martinez filed his Third Amended Original Complaint under Title 42, United States Code, Section 1983 (section 1983), alleging Defendants violated his civil rights protected by the Fourth and Fourteenth Amendments to the United States Constitution [Dkt. 42, at 1]. Plaintiff was shot by police officer David Hinojosa when exiting his house with an AR-15 rifle after disarming an assailant [Dkt. 42, at 1, ¶ 1, at 6-7, ¶¶ 25-27].

---

[1] The Court's memorandum and order dated April 15, 2021, dismissed Officers Benavidez and Cabello with prejudice [Doc. 41, at 6, 17]. Although the third amended complaint omits these officers from the list of parties, see Doc. 42, at 4-5, the case style has not been revised [*Id*. at 1]. Defendants believe Officers Benavidez and Cabello have been appropriately removed from this case.

Plaintiff was shot in the abdomen by Officer David Hinojosa as Plaintiff was attempting to seek refuge with police officers [*Id.*]. Plaintiff alleges he was an innocent third-party seeking safety with police officers and posed no threat of violence toward any person or officer [Dkt. 42, at 7, ¶ 27].

## II. CLAIMS ASSERTED

Plaintiff asserts a section 1983 claim alleging a violation of the Fourth and Fourteenth Amendments to the United States Constitution asserting an unreasonable seizure because excessive force was employed when Plaintiff was shot (the **excessive force claim**) [Dkt. 42, at 12-13, ¶¶ 46-52]; and

Plaintiff has asserted against the City of Laredo (and Officer Hinojosa his official capacity) a section 1983 claim alleging the City has policy or custom of inadequately training, supervising, discipling its police officers which encourage and are the moving force behind the alleged constitutional violations asserted in this case (the **municipal liability claim**) [Dkt. 42, at 14-15, ¶¶ 59-62].

## III. GROUNDS FOR SUMMARY JUDGMENT AND FOR JUDGMENT ON THE PLEADINGS

Officer Hinojosa is entitled to summary judgment on his affirmative defense of qualified immunity, because he has invoked that defense, an adequate time for discovery has passed,[2] and Plaintiff can produce no evidence:

(1)     that Officer Hinojosa violated Plaintiff's constitutional rights to be free from the use of excessive force under the Fourth Amendment; and

(2)     even assuming a constitutional violation, that the unlawfulness of Officer Hinojosa's

---

[2] The discovery period in this case on the issue of qualified immunity is complete–the discovery period expired September 11, 2023 [Doc. 92, at 1]. And these motions are filed on the last day allowed for dispositive motions to be filed [Doc. 95, at 2].

conduct was clearly established at the time of the incident.

Defendants are also entitled to summary judgment on the following grounds:

(3)      because there is no genuine issue of material fact, and as a matter of law, Officer

Hinojosa did not violate Plaintiff's constitutional rights to be free from the use of

excessive force under the Fourth Amendment;

(4)      because there is no genuine issue of material fact, and as a matter of law, even

assuming a constitutional violation, the unlawfulness of Officer Hinojosa's conduct

was note clearly established at the time of the incident.

If Officer Hinojosa is entitled to summary judgment on grounds (1) or (3), the City would

likewise be entitled summary judgment on any claim of municipal liability.

Finally, the City is entitled to judgment on the pleadings because Plaintiff's complaint does

not sufficiently allege any claim for municipal liability, including under the theories of failure to

train, supervise, or ratification.

## IV.  EVIDENCE

Defendants rely on the following evidence, which is attached to and incorporated into this

motion by reference.  These materials will be simply cited as: "Exh. at _____."

Exhibit A:      Officer David Hinojoa's Body Camera Video;

Exhibit B:      Dash Camera Video from Unit 1604;

Exhibit C:      Deposition of Jorge Martinez;

Exhibit D:      Excerpts from Deposition of Officer David Hinojosa; and

Exhibit E:      Voluntary Statement of David Hinojosa.

## V.  STATEMENT OF FACTS

The following facts are admitted and established by the pleadings.  At approximately at 5:30

a.m. on November 26, 2019, members of the Laredo Police Department were called out to 127 Knoll Avenue, Laredo, Texas for a domestic disturbance and shots were fired.  Upon arrival, the officers were met with a barrage of gunfire from an AR-15 style rifle by Cesar Terrazas [Dkt. 42, at 5, ⁋ 19].

Officers returned fire [Dkt. 42, at 5, ⁋ 20].  Cesar Terrazas made his way into the residence at 127 Knoll Avenue where Plaintiff, his sister, and mother live [Dkt. 42, at 5, ⁋ 20].  Terrazas shot and wounded Plaintiff's mother, Elizabeth Perez, and Plaintiff, his sister, and his mother eventually overpowered and disarmed Terrazas [Dkt. 42, at 5, ⁋ 21].    After Plaintiff disarmed Terrazas, he exited the residence holding the rifle [Dkt. 42, at 6, ⁋ 23].  As Plaintiff exited his home, Officer Hinojosa fired a shot which hit Plaintiff in his abdomen, causing him serious injury [Dkt. 42, at 29, ⁋ 29].  Officer Hinojosa was acting in the course and scope of the authority granted to him by the City and the State of Texas as City police officers at all times relevant to the shooting incident [Dkt. 42, at 13, ⁋ 49].

The following additional facts have been ascertained from discovery:

Officer Hinojosa responded to a call for assistance and was informed shots were fired.  After arriving at the scene numerous shots were fired, even in his direction.  He also knew that a fellow officer had been shot.  He did not see the shooter, and did not obtain a description of the shooter over his radio, including whether they were naked or clothed.  He turned his radio down because his radio down because the battery was low, and thus it was beeping, and he did not want to give away his position to the shooter.

Officer Hinojosa could not hear or understand what Plaintiff when he existed the residence. He did not believe it was feasible under those circumstances to give a warning as he did not believe Plaintiff would have been able to hear him.  Plaintiff testified he removed the magazine from the rifle before exiting the residence, but it was still in his hand, and that he did not pull the charging

handle such that there was a round still in the chamber.  Plaintiff also admits that once he reached the street, he turned to the south towards Officer Hinojosa and was shot.

## VI.  ARGUMENT AND AUTHORITIES

### A.    Summary Judgment Standard

Summary judgment should be rendered if the pleadings and discovery, together with any affidavits, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A moving party need not support its motion with affidavits or other evidence negating the non-movant's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  When moving for summary judgment on factual elements that the non-moving party will have the burden of proof at trial, the initial burden of the movant in a summary judgment proceeding is satisfied by "merely point[ing] to the absence of evidence."  *See, e.g., Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995).  This "shifts to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact."  *Id.*; Fed. R. Civ. P. 56(e).

To satisfy this burden, the non-movant is required to present more than "some metaphysical doubt as to the material facts" in order to rebut a valid motion for summary judgment.  *Matsushita Elec. Indus. Co. v. The Zenith Radio Corp.,* 475 U.S. 574, 585, 106 S. Ct. 1348, 1355-56, 89 L. Ed. 2d 538 (1986).  Summary judgment is mandatory when a party fails to establish the existence of an essential element of his case on which that party will bear the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322-24.  The non-moving party must set forth specific facts to establish that there is a genuine issue for trial, and where those submissions lack probative value as to a material fact issue, summary judgment is appropriate.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).

5

**B.    Qualified Immunity**

As a governmental employee at the time of the incident, Officer Hinojosa is entitled to qualified immunity from suit available to governmental officials sued in their individual capacities under section 1983. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects an official whose conduct was objectively reasonable even if the conduct infringed upon a constitutional right of the plaintiff. *Goodson v. Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). Qualified immunity is an immunity from suit, not just from liability. *Harlow v. Fitzgerald,* 457 U.S. 800, 817-18 (1982).

Qualified immunity focuses on what the officer reasonably understood his powers and responsibilities to be at the time he acted. *Snyder v. Trepagnier*, 142 F.3d 791, 800 (5th Cir. 1998) (noting that the actual circumstances may not justify the officer's behavior, but he is entitled to immunity if the facts as they appeared to the officer would make the conduct reasonable). The purpose of the qualified immunity inquiry is to recognize that officers can make reasonable mistakes as to how a legal doctrine will apply. *Saucier v. Katz*, 533 U.S. 194, 197 (2001). In fact, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The qualified immunity analysis involves a two-part test. A court must determine whether the Plaintiff has alleged a violation of a "clearly established" constitutional right. *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004); *accord Saucier v. Katz*, 533 U.S. 194, 201 (2001). A right is "clearly established" for purposes of qualified immunity if "[t]he contours of the right [are] sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 482 U.S. 635, 640 (1987). In other words, the relevant

inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

In addition to finding a violation of a clearly established right, a defendant is nonetheless entitled to immunity if "[his] conduct was objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Collins*, 382 F.3d at 573; *see also Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). Importantly, Plaintiff has the burden of demonstrating the inapplicability of the qualified immunity defense by negating <u>both</u> prongs. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). Furthermore, even if Plaintiff could establish such a violation, qualified immunity protects the Officer Hinojosa, as his conduct was objectively reasonable in light of the circumstances presented. The objective reasonableness of force by a police officer, "depends on the facts and circumstances of the particular case, such that the need for force determines how much force is constitutionally permissible." *Bush*, 513 F.3d at 501 (citing *Ikerd v. Blair*, 101 F.2d 430, 534-35 (5th Cir. 1996)). In making its determination of objective unreasonableness in an excessive force case, a court should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Plaintiff's burden includes properly pleading and ultimately establishing that <u>*no*</u> reasonable official standing in the shoes of the Officers <u>*could*</u> have believed the Officers' conduct was lawful. *Saucier v. Katz*, 531 U.S. 991, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (emphasis added); *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). The applicable jurisprudence emphasizes that each element turns on the circumstances confronting the officer. The analysis is one of objectivity—the subjective thoughts of an officer are not relevant. *Graham v. Conner*, 490

U.S. 386, 397 (1989) (citing *Scott v. United States*, 426 U.S. 128, 137-139 (1978)).

Courts place emphasis on the fact that police officers are forced to make last second judgments in circumstances that are tense, uncertain, and rapidly evolving. *Graham v. Conner*, 490 U.S. 386 (1989). The use of force "must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Id*. Plaintiff cannot negate qualified immunity by arguing that an officer should have chosen a different type of force.

(1)   that the individual Officers were called to a domestic disturbance incident [Doc. 42, at 5, ¶ 19];

(2)   upon arrival fellow officers were met with "a barrage of gunfire" from Ceasar Terrasas (at least 80 rounds were fired) [Doc. 42, at 5, ¶ 20];

(3)   a fellow officer was shot;

(4)   that Ceasar Terrasas went into the residence [Doc. 42, at 5 ¶ 21];

(5)   the shooting stopped for "several minutes" [Doc. 42, at 5, ¶ 22];

(6)   sometime later, an unidentified, naked man exited the residence carrying the AR-15 rifle [Doc. 42, at 5-6, ¶ 22];

(7)   the man was walking out of the home in a non-threatening manner, with the rifle's barrel pointed down, one arm raised, and clearly declaring multiple times he was "not the shooter!" [Doc. 42, at 6 ¶ 23]; and

(8)   Officer Hinojosa was approximately 100 feet away from Plaintiff's residence, but "well within hearing distance" at the time he fired the shot [Doc. 42, at 6, ¶ 25].

The focus must be on what it is alleged the officer perceived, not what the facts might show in hindsight. *Collie v. Barron*, 747 Fed. Appx. 950, 952 (5th Cir. 2018). First, it is clear and undisputed that Plaintiff was carrying a firearm, an AR-15 rifle. While it is alleged Plaintiff removed the clip

8

from the rifle, there is wisely no allegation Officer Hinojosa could perceive that fact from 100 feet away [*Compare* Doc. 42, at 5, ¶ 22 *with* Doc. 42, at 6, ¶¶ 25].  Plaintiff alleges Hinojosa knew he was naked, ostensibly to suggest the officer should have had doubts about whether he was the shooter.  But even assuming Officer Hinojosa saw Terrasas clothed before he entered the residence, that does not preclude the fact he could have disrobed in the "several minutes" he was inside the residence [Dkt. 42, at 5, ¶ 22].  Plaintiff also alleges much about his conduct as he exited his home, but even assuming Officer Hinojosa perceived these facts, nothing absolutely precludes the reasonableness of a perception there was still a threat.  Why did Officer Hinojosa necessarily have to believe Plaintiff's declarations?  Could Plaintiff not have raised the rifle in an instant?  For these very simple reasons, a competent officer could have believed the use of deadly force was justified under these circumstances.

This is a clear case of mistaken identity.  Under those circumstances, the relevant question is whether it was reasonable for an officer in Officer Hinojosa's position to have believed Plaintiff was the shooter exiting the residence.  *Blackwell v. Barton*, 34 F.3d 298, 303-04 (5th Cir. 1994).  Stated another way, Plaintiff must plead—and ultimately prove—no reasonable officer in Officer Hinojosa's situation could have believed Plaintiff was the shooter.  As noted above, the best allegation Plaintiff can muster is one that Officer Hinojosa *could have believed* Plaintiff was some other than the shooter.

## C.    Standard of Review under Rule 12(c)

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  A motion brought pursuant to Rule 12(c) "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts."  *Hebert Abstract Co., Inc. v. Touchstone Props., Ltd.,* 914 F.2d 74, 76 (5th

Cir.1990). A motion for judgment on the pleadings is reviewed under the same standard as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Guidry v. Am. Pub. Life Ins. Co.,* 512 F.3d 177, 180 (5th Cir.2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). For purposes of a motion under Rule 12(c), the pleadings are "closed" when the complaint and answer are filed, there is no court-ordered reply and no counterclaim, cross-claim or third-party claim is interposed. *Darocy v. Grand Lending Group, L.P.*, No. 3:10-CV-1259-L, 2010 WL 3858724 at *2 (N.D. Tex. Sept. 30, 2010).

To defeat a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal,* 556 U.S. 662, 687, 129 S. Ct. 1937, 1949 (2009). The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly,* 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonner v. State Farm Mutual Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007). The court is not bound to accept legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal,* 129 S. Ct. at 1949-50. When there are well-pleaded factual allegations, courts assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

10

*Id.*

## D.  Municipal Liability: Failure to Train, Supervise, or Ratification Theories Not Sufficiently Alleged

A municipality may be liable under Section 1983 if it is alleged to have caused a constitutional tort through a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers.  *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978).  Alternatively, municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval.  *Id.* at 690-91.  Municipal liability under Section 1983 requires proof of three elements: a policymaker, an official policy, and a violation of constitutional rights whose moving force is the policy or custom. *Zarnow v. City of Wichita Falls, Texas,* 614 F.3d 161, 166 (5th Cir. 2010).  A municipality may not be held liable merely for employing a tortfeasor.  *Id.* at 167.  Municipal liability requires deliberate action attributable to the municipality that is the direct cause of the alleged constitutional violation. *Id.*

It has been previously held in this case in the order on Defendants' motion to dismiss that Plaintiff has not alleged an official policy or custom to support a claim for municipal liability [Doc. 52, at 20-21].  The Court, however, declined to address three other independent theories of municipal liability because they were not specifically addressed in the motion to dismiss: (1) failure to train, (2) failure to supervise; and (3) ratification [Doc. 52, at 19 n.16].  The purpose of this rule 12(c) motion is to address those theories.

First, there is no proper allegation of a failure to train theory.  To prevail on this theory, a plaintiff must plead: (1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate

training policy directly caused the violations in question. *Zarnow v. City of Wichita Falls, Texas,* 614 F.3d 161, 170 (5th Cir. 2010). In addition, a plaintiff must allege with specificity how a particular training program is defective. *Id.* In this case, Plaintiff has failed to identify any training procedure of the City, failed to allege that the City was deliberately indifferent in adopting its training policy, failed to allege that the inadequate training directly caused Plaintiff's injuries, and failed to allege with specificity how any training program of the City is defective. Accordingly, Plaintiff failed to adequately plead a cause of action against the City under Section 1983 for failure to train.

As for any failure to supervise theory of municipal liability, the same standards of fault and causation apply to the liability of a municipality for failure to supervise as apply to an individual supervisor's liability for failure to supervise. *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 453 (5th Cir. 1994) (en banc). In order to prevail on a theory of "failure to supervise," a plaintiff must establish: (1) that a supervisor either failed to supervise or train the subordinate official; (2) that a causal link exists between the failure to train or supervise and the violation of his rights; and (3) that the failure to train or supervise amounts to deliberate indifference. *Smith v. Brenoettsy,* 158 F.3d 908, 911-12 (5th Cir. 1998). Specifically, the plaintiff must show that the misconduct of a subordinate is conclusively linked to the action or inaction of a supervisor. *Zarnow,* 614 F.3d at 169; *Taylor Indep. Sch. Dist.,* 15 F.3d at 453. In this case, Plaintiff's allegations fail to identify a supervisor and fail to plead any facts which would demonstrate that the actions of the Officer Hinojosa were "conclusively linked" to the actions or inaction of a supervisor. For these reasons, Plaintiff has failed to plead a cause of action against the City under Section 1983 for failure to supervise.

The ratification theory of municipal liability is only applied to and limited to "extreme factual situations." *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998). It would be incredible to

12

suggest this case presents such an extreme factual situation.  *Compare Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) (finding ratification in case in which officers "poured" gunfire onto a truck and killed innocent occupant), *with Snyder*, 142 F.3d at 798 (refusing to find ratification in case in which officer shot fleeing suspect in the back).

## VII.  CONCLUSION AND PRAYER

**WHEREFORE PREMISES CONSIDERED**, Defendants pray that the Court grant this motion,  and that Plaintiff's claims, in their entirety, be dismissed with prejudice; that Final Judgment be entered disposing of this case; or such partial relief as the Court deems just, and for such  other and further relief, in equity or in law, to which they may show themselves justly entitled.

Respectfully submitted,

William M. McKamie, Texas Bar No. 13686800
Southern Dist. I.D. No. 13010
Email: mmckamie@toase.com

Fredrick "Fritz" Quast, Texas Bar No. 24032974
Southern Dist. I.D. No. 3327433
Email: fquast@toase.com
Lindsey Hale, Texas Bar No. 24096435
Southern Dist. I.D. No. 3499360
Email: lhale@toase.com
**Taylor, Olson, Adkins, Sralla & Elam, L.L.P.**
6000 Western Place, Suite 200
Fort Worth, Texas 76107
Telephone No. (817) 332-2580
Facsimile No. (817) 332.4740

13

## <u>CERTIFICATE OF SERVICE</u>

A true and correct copy of the above and foregoing document has been served on all counsel of record in accordance with Federal Rules of Civil Procedure on November 3, 2023.

David L. Flores
dflores@rgvfirm.com
John R. Griffith
jrg@rgvfirm.com
The Griffith Law Group
4228 North McColl
McAllen, Texas 78504

Fredrick "Fritz" Quast

## **Exhibit A**

(Officer David Hinojosa's Body Camera Video, dated 11/26/19 – 1 DVD being mailed by separate cover to both the clerk of the court and to opposing counsel)



**<u>Exhibit B</u>**

(Dash Camera Video from Unit 1604, dated 11/26/19 – 1 DVD being mailed by separate cover to both the clerk of the court and to opposing counsel)



**<u>Exhibit C</u>**

(Deposition Transcript of Jorge Martinez taken on September 7, 2023)

# *ACE COURT REPORTING SERVICE LLC*

*Statewide & Nationwide Scheduling*
*Rio Grande Valley * Laredo * Corpus Christi * San Antonio * Austin  * Houston*

*Oral and Videotaped Deposition of  Jorge MARTINEZ*
*Taken on September 7, 2023*

*5:20-CV-00075; JORGE R. MARTINEZ v. OFFICER DAVID HINOJOSA,*
*individually and in his  official capacity; AND THE CITY OF LAREDO, TEXAS,*

## *ACE COURT REPORTING SERVICE LLC*
### *CERTIFIED SHORTHAND REPORTERS*
*220 E. University Dr., Edinburg, TX  78539*
*Firm Registration No. 476, Exp. Date:  5/31/24*
*Telephone: (956) 380-1100*
*E-mail: info@acecourtreporting.com*

Jorge MARTINEZ                                        September 7, 2023

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    LAREDO DIVISION

 3   JORGE R. MARTINEZ,          §
                                 §
 4                               §
     vs.                         § CASE NO. 5:20-CV-00075
 5                               §
     OFFICER DAVID HINOJOSA,     §
 6   individually and in his     §
     official capacity; AND THE  §
 7   CITY OF LAREDO, TEXAS,      §
                                 §
 8

 9

10            ORAL AND VIDEOTAPED DEPOSITION

11               JORGE ROEL MARTINEZ

12                September 7, 2023

13

14

15            ORAL AND VIDEOTAPED DEPOSITION OF JORGE ROEL

16   MARTINEZ, produced as a witness at the instance of the

17   Defendant and duly sworn, was taken in the above-styled

18   and numbered cause on September 7, 2023, from 9:48 a.m.

19   to 10:39 a.m., before Christina Sabedra, Certified

20   Shorthand Reporter, in and for the State of Texas,

21   reported by computerized oral stenography at the offices

22   of Laredo Police Department Headquarters, 4712 Maher

23   Ave, Laredo, Texas 78041, pursuant to the Federal Rules

24   of Civil Procedure and the provisions stated on the

25   record or attached hereto.
```

Jorge MARTINEZ                                      September 7, 2023

Page 2

```
 1                        APPEARANCES
 2    ATTORNEY FOR PLAINTIFF:
 3             David L. Flores
               The Griffith Law Group
 4             4228 North McColl
               McAllen, Texas 78504
 5             Telephone: (956) 279-9446
               E-mail: dflores@rgvfirm.com
 6
      ATTORNEY FOR DEFENDANT:
 7
               Fredrick "Fritz" Quast
 8             Taylor, Olson, Adkins, Sralla & Elam, L.L.P.
               6000 Western Place, Suite 200
 9             Fort Worth, Texas 76107
               Telephone: (817) 332-2580
10             Fax:  (817) 332.4740
               E-mail: fquast@toase.com
11
12    ALSO PRESENT:
13             Luis Estrada, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

Jorge MARTINEZ                                         September 7, 2023

Page 3

```
 1                           INDEX
 2   WITNESS:                                      PAGE
 3           JORGE ROEL MARTINEZ
 4           Examination by Mr. Quast             4
 5           Examination by Mr. Flores            31
 6   Errata Sheet                                 34
 7   Witness Signature                            35
 8   Court Reporters Certification                36
 9
10
11                         EXHIBITS
12   NO.          DESCRIPTION                     PAGE
13   2            Map                             13
14   28           Photograph - Rifle              19
15   9*           Dash Cam Video - Laredo PD      20
16   *Retained by counsel
17
18
19
20
21
22
23
24
25
```

ACE COURT REPORTING SERVICE LLC

Jorge MARTINEZ                                          September 7, 2023

                                                               Page 4

```
 1                  P-R-O-C-E-E-D-I-N-G-S
 2   Whereupon,
 3   9:48 a.m.
 4
 5                  THE VIDEOGRAPHER:   We're on the record.
 6   Today's date is September 7th, 2023.  The time is
 7   9:48 a.m.
 8                  THE COURT REPORTER:   All right.  Will
 9   counsel please state your appearances and who you
10   represent, starting with the plaintiff.
11                  MR. FLORES:   David Flores here on behalf
12   of the plaintiff, Jorge Martinez.
13                  MR. QUAST:   Fredrick "Fritz" Quast, I'm
14   here on behalf of defendants, the City of the Laredo,
15   Texas and Officer David Hinojosa.
16                  JORGE ROEL MARTINEZ,
17   having been first duly sworn, testified as follows:
18                  THE COURT REPORTER:   Thank you, sir, you
19   may put your hand down.  Mr. Quast, you may begin.
20                  EXAMINATION
21   BY MR. QUAST:
22        Q.   Mr. Martinez, will you please state your full
23   name for the record.
24        A.   Jorge Roel Martinez.
25        Q.   Can you spell that out, please?
```

Jorge MARTINEZ                                    September 7, 2023

 1        A.    J-O-R-G-E, R-O-E-L, M-A-R-T-I-N-E-Z.

 2        Q.    And of course, you understand that we're here

 3   taking your deposition today concerning a court case, a

 4   federal court case where you're the plaintiff; is

 5   that -- is that correct?

 6        A.    Yes.

 7        Q.    And you have sued the City of Laredo and

 8   initially three officers concerning a shooting incident

 9   that occurred at 127 Knoll; is that correct?

10        A.    Yes.

11        Q.    And that was back on November the 26th of

12   2019; is the right?

13        A.    Yes.

14        Q.    And again, you are the plaintiff; that's

15   right?

16        A.    Yes.

17        Q.    And you were injured during that instance; is

18   that correct?

19        A.    Yes, sir.

20        Q.    Okay.  You understand, of course, that I am

21   the lawyer representing the adverse parties in this

22   case.  Originally the suit was against the City -- David

23   Hinojosa, Arturo Benavides, and Anthony Cabello; is that

24   correct?

25        A.    Yes.

Jorge MARTINEZ                                    September 7, 2023

```
 1          Q.   Okay.  Speaking of 127 Knoll Avenue where this
 2     happened, you were living there at the time; is that
 3     right?
 4          A.   Yes, sir.
 5          Q.   You still live there?
 6          A.   Yes, sir.
 7          Q.   Okay.  How long have you lived there?
 8          A.   I want to say about seven years --
 9          Q.   Okay.
10          A.   Seven, eight years.
11          Q.   How old are you by the way, now?
12          A.   I just turned 25.
13          Q.   Okay.  I probably already know the answer to
14     this, but have you ever given your deposition before in
15     your 25 long years?
16          A.   No.
17          Q.   Okay.  Any court testimony before?
18          A.   No.
19          Q.   Okay.  So first of all, I want to go over some
20     kind of ground rules so that we understand each other.
21     First of all, this is not a race, I want to get out of
22     here as much as you do, but we need to take our time in
23     doing this; do you understand?
24          A.   Yes, sir.
25          Q.   Okay.  So if I ask you a question and you
```

Jorge MARTINEZ                                        September 7, 2023

 1   don't understand it, you can make me rephrase it or

 2   reask it as many times as you want to; do you understand

 3   that?

 4        A.   Yes, sir.

 5        Q.   Okay.  And when I ask you a question, I want

 6   you to take your time also to think about carefully how

 7   you answer it.  You, of course, are under oath and I

 8   think you know what that means, correct?

 9        A.   Yes, sir.

10        Q.   Okay.  Another reason why we need to take this

11   slow is we need to be careful not to speak at the same

12   time, to make sure that the court reporter takes down an

13   accurate record because if people are speaking at the

14   same time, it's impossible for her to take that down on

15   a written transcript; do you understand?

16        A.   Yes, sir.

17        Q.   Okay.  So just a little bit about your

18   background, are you currently employed?

19        A.   Yes, sir.

20        Q.   What do you do?

21        A.   Service adviser.

22        Q.   For?

23        A.   BMG Extreme Sports.

24        Q.   Okay.  What is that?

25        A.   Polaris dealership.

Jorge MARTINEZ                                    September 7, 2023

Page 8

```
 1          Q.    I'm sorry.

 2          A.    A Polaris -- a Polaris dealership.

 3          Q.    I understand, okay.  So ATVs?

 4          A.    UTVs.

 5          Q.    Okay.  All right.  So you -- do you sell them

 6   just here at the dealership or are you a regional

 7   distributor or regional sales or?

 8          A.    I'm just with the service department.

 9          Q.    Okay.

10          A.    Repairs.

11          Q.    I got you.  How long have you been there?

12          A.    Eight months.

13          Q.    Okay.  Where were you employed before?

14          A.    Kansas City Southern Railway.

15          Q.    Okay.  What did you do for the KC?

16          A.    Conductor.

17          Q.    Okay.  How long were you in that?

18          A.    Two and a half years.

19          Q.    Anything before that?

20          A.    Yes, I was employed with Union Pacific.

21          Q.    Okay.  Another railroad job, also as a

22   conductor?

23          A.    Yes, sir.

24          Q.    And how long was the UP job?

25          A.    A year.
```

ACE COURT REPORTING SERVICE LLC

Jorge MARTINEZ                                    September 7, 2023

Page 9

1        Q.   Okay.  Where did you graduate high school and
2   when did you graduate?
3        A.   Laredo, Texas in 2017.
4        Q.   Which high school?
5        A.   United High School.
6        Q.   Okay.  You said 2017; is that correct?
7        A.   Yes, sir.
8        Q.   Okay.  Do you have any experience in the
9   military?
10       A.   No, sir.
11       Q.   Okay.  Do you have any criminal history beyond
12  traffic citations?
13       A.   No, sir.
14       Q.   Okay.  No -- no traffic citations either or?
15       A.   That I have on my record I sh -- no.
16       Q.   Okay.  So I think it goes with out saying,
17  you've never been arrested?
18       A.   No, sir.
19       Q.   You've never been convicted of -- of anything?
20       A.   No, sir.
21       Q.   Okay.  Do you have any experience with
22  handguns?
23       A.   No, sir.
24       Q.   Do you have any experience with any firearms
25  or long weapons?

Jorge MARTINEZ                                    September 7, 2023

```
 1        A.    No, sir.

 2        Q.    Do you have any weapons training to speak of?

 3        A.    Yes.

 4        Q.    Okay.  What is that?

 5        A.    The license to carry.

 6        Q.    Okay.

 7        A.    That's -- that's all I have of experience.

 8        Q.    So do you -- do you own a handgun?

 9        A.    Yes, sir.

10        Q.    Okay.  Do you open carry or conceal it?

11        A.    Conceal.

12        Q.    Okay.  Do you wear it on your shoulder holster

13   or?

14        A.    Inside waistband.

15        Q.    Okay.  Is that -- how long have you had that

16   conceal license?

17        A.    Since November 26, 2019.

18        Q.    I'm not gonna ask you why you got that

19   license, okay.  All right.  Do you have any experience

20   with -- with -- with rifles?

21        A.    No, sir.  No, sir.

22        Q.    Have you ever carried a rifle?

23        A.    No.

24        Q.    Have you ever used one?

25        A.    Yes.
```

Jorge MARTINEZ                                      September 7, 2023

```
 1        Q.    When was that?
 2        A.    I don't recall the last time I -- I used a
 3   rifle.
 4        Q.    Was it -- were you hunting or?
 5        A.    Ranch, just being at the ranch, hanging out of
 6   the ranch, shooting targets.
 7        Q.    Okay.  Shooting targets and cans and what have
 8   you.  What kind of -- what kind of rifle was that or do
 9   you remember?
10        A.    AR-15.
11        Q.    Okay.  Was this before or after the -- the
12   incident that's the subject of this lawsuit?
13        A.    After.
14        Q.    Okay.  Did you have any experience with an
15   AR-15 before November the 26th, 2019?
16        A.    No.
17        Q.    Okay.  Another couple of things I wanna --
18   wanna go over.  Of course, we've discussed -- you need
19   to understand this is not a test; do you understand
20   that?
21        A.    Yes, sir.
22        Q.    Okay.  You also understand that you are under
23   oath?
24        A.    Yes, sir.
25        Q.    And I'm gonna ask you that you not guess or
```

ACE COURT REPORTING SERVICE LLC

Jorge MARTINEZ                                    September 7, 2023

Page 12

```
 1  speculate when you're giving your answers; is that-- is
 2  that fair --
 3       A.   Yes, sir.
 4       Q.   -- do we agree to that?  What was your answer?
 5       A.   Yes, sir.
 6       Q.   Okay.  It's -- it's okay to not know the
 7  answer and not remember something; do you understand?
 8       A.   Yes, sir.
 9       Q.   Okay.  And I just want to make sure you
10  understand that if you don't remember something, given
11  what happened on the morning of November 26, 2019, I
12  don't think anybody's gonna blame you; do you agree with
13  that?
14       A.   Yes, sir.
15       Q.   I also realize that given that experience you
16  might remember everything like it was in slow-motion,
17  right?
18       A.   Yes, sir.
19       Q.   Okay.  I'm just asking just, if you don't
20  know, don't guess.  Can we -- can we agree to that?
21       A.   Yes, sir.
22       Q.   All right.  First thing and just some
23  housekeeping items.  I'm handing you what's been
24  previously been marked as Deposition Exhibit Number --
25  excuse me.  Let's put these over here.  Deposition
```

ACE COURT REPORTING SERVICE LLC

Jorge MARTINEZ                                    September 7, 2023

```
 1   Exhibit Number 4.  Can you tell me what that picture
 2   depicts?
 3                  (Exhibit marked for identification as
 4                  Deposition Exhibit Number 4.)
 5       A.   Location of the incident.
 6       Q.   Okay.  Could you be a little more specific?
 7       A.   These markings I want -- they're markings
 8   where there was police officers, I'd want to say or
 9   units, the location of my house.
10       Q.   What about the dropped pin?  Tell me about
11   that.
12       A.   That's the location of my house.
13       Q.   That's currently your house still, correct?
14       A.   Yes, sir.
15       Q.   Okay.  Okay.  So I'm not gonna -- so on the
16   night in question, Mr. Cesar Tevarez (sic) came into the
17   house through the side window; is that correct?
18       A.   Yes, sir.
19       Q.   And that was on the northern side of house; is
20   that right?
21       A.   Yes, sir.
22       Q.   All right.  I'm not gonna rehash the details
23   about what happened after he came through the window.
24   Is that all right?
25       A.   Yes, sir.
```

Jorge MARTINEZ                                September 7, 2023

Page 14

```
 1        Q.   I don't -- I don't think it's relevant to this
 2   case, and so we're not gonna go through it, but to make
 3   a long story short, Mr. Terrazas shot your mother in the
 4   arm; is that correct?
 5        A.   Not in her arm.
 6        Q.   Okay.  But he did shoot your mother and -- and
 7   injured her; is that correct?
 8        A.   Yes, sir.
 9        Q.   Okay.  And at some point you and your sister
10   were able to disarm Mr. Terrazas; is that correct?
11        A.   Yes.
12        Q.   What room in the house did that occur in?
13        A.   Living room.
14        Q.   Okay.  How long do you think you all were in
15   the house once you realized that Mr. Terrazas was in the
16   house, and the time that you exited the front door?  Can
17   you give an estimation of how long that was?
18        A.   I'll --
19        Q.   And if you can't, that's okay?
20        A.   Yeah, I wouldn't -- I don't recall off the
21   top --
22        Q.   Okay.  Again, I don't want you to guess,
23   remember.  All right.  So you eventually obtained
24   possession of the rifle, correct?
25        A.   Yes, sir.
```

Jorge MARTINEZ                                    September 7, 2023

Page 15

1       Q.   And you were still inside the living room; is
2   that correct?
3       A.   Yes, sir.
4       Q.   Okay.  What do you do to the rifle once you
5   have it in your possession?
6       A.   I removed the magazine.
7       Q.   And you did that by depressing the magazine
8   release button on the right hand side of the weapon; is
9   that correct?  Or do you remember?
10      A.   I don't recall the side of the -- of the
11  button to release the mag.
12      Q.   Okay.  But you pulled the magazine out, right?
13      A.   Yes, sir.
14      Q.   Did you do anything else to the rifle before
15  you exited the house?
16      A.   Yes.
17      Q.   What did you do?
18      A.   I flipped the gun barrel facing down.
19      Q.   Okay.  I'm going to ask you to clarify that.
20           So if you're holding the gun right side
21  up, you removed the magazine and flipped it to where the
22  magazine well was facing upwards; is that correct?
23      A.   I don't recall.
24      Q.   You don't recall?
25      A.   No, sir.

Jorge MARTINEZ                                    September 7, 2023

Page 16

1      Q.   So what do you mean when you said earlier that
2  you flipped it?
3      A.   I faced the -- I faced the gun barrel facing
4  down.
5      Q.   Okay.  But do you know what a -- do you know
6  what a bull clip is on an AR-15?
7      A.   No.
8      Q.   Do you know what the charging handle is --
9      A.   Yes.
10      Q.   -- on an AR-15?  But here all you did was
11  remove the magazine, were you aware that there could
12  still be a live cartridge in the chamber?
13      A.   Yes, sir.
14      Q.   Okay.  But you didn't depress the bull clip,
15  pull the charging handle, and express any cartridge that
16  may have been in there; is that correct?
17      A.   Could you say that one more time?
18      Q.   After you took the magazine out, you did not
19  depress the bull clip, pull the charging handle back,
20  and express any the cartridge that may have been inside
21  the rifle?
22      A.   That's correct.
23      Q.   Okay.  And again, when you removed the
24  magazine, you were still inside?
25      A.   Yes, sir.

Jorge MARTINEZ                                        September 7, 2023

Page 17

 1          Q.    And at some point you decided you needed to
 2    leave the residence; is that correct?
 3          A.    You could rephrase that?
 4          Q.    You walked out the front door?
 5          A.    Yes, sir.
 6          Q.    Is all right?
 7          A.    Yes, sir.
 8          Q.    You still had the rifle with you; is that
 9    correct?
10          A.    Yes, sir.
11          Q.    And you still had the magazine in your
12    possession?
13          A.    Yes, sir.
14          Q.    So which -- which hand were you holding the
15    rifle with?
16          A.    My left hand.
17          Q.    Where was the magazine?
18          A.    My right hand.
19          Q.    Okay so what -- what kind of door is there
20    at -- at the house?  Is it -- is there a screen door or
21    is there a bolt on it or how did you?
22          A.    It's just a regular white door.
23          Q.    Okay.  And you walked out and when you were
24    immediately outside the front door, where -- again, you
25    said in your left hand you're holding the magazine; is

Jorge MARTINEZ                                   September 7, 2023

 1  that correct?

 2        A.    No, sir.

 3        Q.    I'm sorry.  Do I have them switched?

 4        A.    Yes, sir.

 5        Q.    In your left hand you had the rifle?

 6        A.    Yes, sir.

 7        Q.    And it was pointed down?

 8        A.    Yes, sir.

 9        Q.    But it wasn't flipped over, such the magazine

10  well was facing upward, right?

11        A.    No.  No.  It wasn't facing up.

12        Q.    The magazine well was not facing up, it wasn't

13  upside down in other words; is that correct?

14        A.    Upside down like up?  (Witness gesturing.)

15        Q.    Yes.

16        A.    No.

17        Q.    Okay.  And in your right hand was the

18  magazine; is that correct?

19        A.    Yes, sir.

20        Q.    Okay.  And when you say you were pointing the

21  gun down, how far down were you pointing it?  Would you

22  say 20 degrees down?  90, being straight down?

23  30 degrees down?

24        A.    Straight down, 90 degrees.

25        Q.    Straight down.  Where was your hand that was

Jorge MARTINEZ                                    September 7, 2023

 1    holding the magazine?
 2         A.    (Witness gesturing.)
 3         Q.    Could you go ahead and verbalize that for the
 4    record?
 5         A.    Facing up above my head.  High, a little bit
 6    above, higher than my head.
 7         Q.    Okay.  Okay.  I'm gonna show you what's now
 8    been marked as Deposition Exhibit 28.  I would like for
 9    you to look at that and ask if you can identify what is
10    depicted in that picture?
11                    (Exhibit marked for identification as
12                    Deposition Exhibit Number 28.)
13         A.    Terrazas rifle.
14         Q.    Okay.  So when you're holding it in your left
15    hand, can you point and tell me where you were gripping
16    the rifle?
17         A.    Right here.  This area.
18         Q.    Okay.  Could you take this red pen and draw a
19    circle around the area that you were gripping?
20         A.    (Witness complies).
21         Q.    Okay.  And is that red circle a fair and
22    accurate depiction of where you were gripping the rifle
23    with your left hand?
24         A.    Yes, sir.
25         Q.    Okay.  All right.  Now, I'm gonna show you a

Jorge MARTINEZ                                    September 7, 2023

```
 1   video that's previously been designated, I believe as
 2   Deposition Exhibit 8 (sic).
 3                   MR. FLORES:   The body cam?
 4                   MR. QUAST:   Huh?
 5                   MR. FLORES:   The body cam?
 6                   MR. QUAST:   I thought it was -- I'm
 7   looking at -- this is the dash cam from 160 --
 8                   MR. FLORES:   I thought the dash cam was
 9   9?
10                   MR. QUAST:   Huh?
11                   MR. FLORES:   I might -- I might be
12   wrong, I thought the dash cam was 9.
13                   THE COURT REPORTER:   I'm sorry.  Can we
14   go off the record?  I apologize.
15                   THE VIDEOGRAPHER:   The time is
16   10:08 a.m., we're off the record.
17                   (Break taken from 10:08 a.m. to
18                   10:15 a.m.)
19                   THE VIDEOGRAPHER:   We're on the record
20   the time is 10:15 a.m.
21                   (Exhibit marked for identification as
22                   Deposition Exhibit Number 9.)
23      Q.  (By Mr. Quast) All right.  Mr. Martinez, I'm
24   showing you a video that has been marked as either
25   Deposition Exhibit 8 or 9.  Once we figure that out we
```

ACE COURT REPORTING SERVICE LLC

Jorge MARTINEZ                                    September 7, 2023

Page 21

 1    will -- we will clarify.  But it's previously been

 2    discussed in prior depositions in this case.  Can you

 3    look and -- and again, can you read, I don't have it at

 4    the first of the video.  Could you read the timestamp up

 5    there at the top, right here?

 6         A.    5:55.

 7         Q.    How many seconds?

 8         A.    Twelve seconds.

 9         Q.    Okay.  Can you look at what's depicted in this

10    paused video and tell me where that is?

11         A.    At the block before the 127 Knoll.

12         Q.    Okay.  And if you could just very generally

13    describe, do -- so you see your -- your house or perhaps

14    a light that's on your house?

15         A.    Yes, sir.

16         Q.    Okay.  Could you -- could you point to that?

17         A.    (Witness complies.)

18         Q.    And let the record reflect there's a stop sign

19    depicted in the video and it's the brightest light just

20    to the right of that.  And where is that light on your

21    house?

22         A.    On the driveway.

23         Q.    So between, you know, in the middle of the

24    driveway?  On the side of the driveway, or?

25         A.    In between the garage door.

ACE COURT REPORTING SERVICE LLC

Jorge MARTINEZ                                    September 7, 2023

```
 1        Q.   So there are two garage doors and that's the
 2   light in between the two, correct?
 3        A.   No.
 4        Q.   Okay.  Where is it?
 5        A.   It's one garage door, one on each side of
 6   it -- each --
 7        Q.   I see.
 8        A.   -- the garage door.
 9        Q.   So you don't know whether that light is the
10   one that's to the north side of the garage or the south
11   side of the garage?
12        A.   On the north side of the garage.
13        Q.   Okay.  All right.  I'm gonna start playing
14   this video, and again, it is at 5:55.  Let's go back
15   just a little bit because, by maybe ten seconds.  All
16   right.  Now, what does the timestamp read?
17        A.   5:54:58.
18        Q.   Okay.  I'm gonna start playing it and I want
19   you to look at that light and tell me when you see
20   movement.  You ready?  Hold on a second.  I'm sorry,
21   y'all, it's paused.
22                  (Plays video.)
23        Q.   (By Mr. Quast) Did you see movement just then?
24        A.   Yes, sir.
25        Q.   Okay.  Who you think that was?
```

ACE COURT REPORTING SERVICE LLC

Jorge MARTINEZ                                    September 7, 2023

Page 23

```
 1        A.    Me.
 2        Q.    Okay.  So at this point we see you move past
 3   the garage, right?  Is that correct?
 4        A.    Yes.
 5        Q.    Are you between the cars at the point?
 6        A.    No.
 7        Q.    Okay.  You are still in the yard; is that
 8   right?
 9        A.    No.
10        Q.    Where were you?
11        A.    Next to, we have two cars.  Next to the first,
12   on the far south.
13        Q.    But you're still in the driveway, just not in
14   between the cars, right?
15        A.    Yes.
16        Q.    Okay.  It's alleged and I think there's some
17   evidence that you started saying that you are not the
18   shooter.  Do you remember when you started saying that?
19        A.    Not exactly, but I do.
20        Q.    Okay.  Well, can you -- can you narrow it down
21   to me as much as possible.  At this point where you had
22   walked down, let's call it the south side of the
23   driveway, had you started saying anything yet?
24        A.    Yes.
25        Q.    Okay.  Where were you when you first said "I
```

ACE COURT REPORTING SERVICE LLC

Jorge MARTINEZ                                    September 7, 2023

Page 24

1    am not the shooter?"

2         A.   Exiting the door, the house door.

3         Q.   Okay.  Between the house door and this point

4    to where you've walked down the southern edge of the

5    driveway, how many times have you said "I am not the

6    shooter" or do you remember?

7         A.   I don't remember how many times.

8         Q.   Okay.  All right.  Let's continue.

9              (Plays video.)

10        Q.   (By Mr. Quast) Could you note the time stamp?

11   I just paused it at, what is it?

12        A.   5:56:02.

13        Q.   Okay. And it looked like there was some

14   movement once you walked down the southern side of the

15   driveway, correct?  You came back up the driveway,

16   right?

17        A.   Yes, sir.

18        Q.   Okay.  Between the front door and were we

19   first see you in the light, where were your hands?

20        A.   On the side of my body.  On each side of my

21   body, one and one.

22        Q.   Okay.  I think earlier you testified that the

23   clip was -- was in the air, but at some point you

24   dropped your hands down; is that correct?

25        A.   No.

Jorge MARTINEZ                                    September 7, 2023

```
 1        Q.   Okay.  Explain to me.  You walk outside?
 2        A.   I walk out the door with the position of the
 3   magazine above my head and the rifle mid-body on my left
 4   side.  Once -- once I pass the gara -- the gara -- where
 5   I come out -- that's -- I still have my hand above my
 6   head, but I've always had them on my side both -- both
 7   my hands.
 8        Q.   Okay.  And when you turn around the western
 9   side -- I'm sorry, the southern side of the driveway and
10   walk back up, do you change the position of your hands
11   in any way?
12        A.   No.
13        Q.   Okay.  And then after that you walked to the
14   north at the closest to the garage, and then you
15   proceeded down between the two cars; is that right?
16        A.   Yes, sir.
17        Q.   Did you change the position of your hands at
18   any time during that?
19        A.   No, sir.
20        Q.   Okay.  We're gonna go ahead and play a little
21   more.
22                  (Plays video.)
23        Q.  (By Mr. Quast) Wait a minute.  Looks like
24   all righty.
25                  Could you help with the timestamp there,
```

Jorge MARTINEZ                                      September 7, 2023

Page 26

```
 1   what is it?
 2        A.    5:55 with 47 seconds.
 3        Q.    Okay.  I'm gonna start it now.
 4              (Plays video.)
 5        Q.    (By Mr. Quast) So in that interlude we saw you
 6   walk down the southern side of the driveway, come back
 7   up, come between the cars, and then walk down between
 8   the two cars; is that correct?
 9              MR. FLORES:    Objection, form.
10        Q.    (By Mr. Quast) Okay.  Describe to me what you
11   saw there.
12        A.    I walked down in between both cars towards the
13   street looking for help.
14        Q.    Okay.
15        A.    I was gonna surrender the weapon and the
16   magazine to the police.
17        Q.    Okay.  And again, you were saying "I am not
18   the shooter?"
19        A.    Yes, sir.
20        Q.    How many times do you think between you
21   walking up the drive -- the southern side of the
22   driveway.  Do you have any estimate of how many times
23   you said you were not the shooter?
24        A.    I want to say four or five times.
25        Q.    Okay.  What direction were you facing when you
```

Jorge MARTINEZ                                    September 7, 2023

Page 27

1   said that?  Were you facing west or were you facing back

2   towards the car?

3        A.   I was saying it as I was walking, it was

4   different every time I would turn positions.

5        Q.   Okay.  Did you ever turn and face to the south

6   and say "I am not the shooter?"  In other words, south

7   being where we're looking towards in this video?

8        A.   I don't recall.

9        Q.   Okay.  All right.  Well, one last thing here.

10  And I know -- I mean -- I apologize, I know this was a

11  traumatic experience for you, but I'm just trying to

12  figure out what happened.  All right.  We're gonna back

13  it up to 5:55:41; is that correct?

14       A.   Yes, sir.

15       Q.   All right.  I'm gonna play it and I want you

16  to pay particular attention, when you get to the street

17  and you're in front of that pickup, all right?

18       A.   Yes, sir.

19                 (Plays video.)

20       Q.   (By Mr. Quast) Did you hear that?

21       A.   Yes, sir.

22       Q.   What was that?

23       A.   Gun shot.

24       Q.   Okay.  Did you see any movement?  Did it look

25  like you were turning back towards the pickup, just

Jorge MARTINEZ                                      September 7, 2023

 1    before the gunshot?  And --
 2         A.   Not towards the pickup.
 3         Q.   Were -- but you were turning; is that correct?
 4         A.   Yes.
 5         Q.   Where were you turning towards?
 6         A.   Towards the driveway -- towards the area of
 7    this unit that's right here and the driveway.
 8         Q.   What do you mean by "this unit right here?"
 9         A.   The unit that's playing -- that's the unit
10    cam.
11         Q.   So when you turned you were facing west down
12    the driveway, and the turning movement we see is you
13    turning to the north; is that correct?
14         A.   Can you replay that one more time?
15         Q.   Sure.
16              (Plays video.)
17         Q.   (By Mr. Quast) Do you need to see it again?
18         A.   No, I -- I saw it.
19         Q.   Okay.  Could you describe for the jury what
20    your turning movement was?
21         A.   Looking for help.
22         Q.   Okay.  Which direction did you turn?
23         A.   Towards the pickup.
24         Q.   Towards the pickup.
25         A.   Yes, sir.

Jorge MARTINEZ                                September 7, 2023

```
1        Q.   And that is, again, to the south of where
2   you're standing; is that right?
3        A.   Yes.
4        Q.   Okay.  When you made that turning movement,
5   could you describe for the jury how you were holding the
6   rifle?
7        A.   Well, with my mid -- mid-body, halfway barrel
8   still facing down.
9        Q.   Was it pointed completely at the ground, like,
10  directly at the ground?
11       A.   I don't recall.
12       Q.   Okay.  Did you still have your right hand
13  above your head at the point?
14       A.   I don't recall.
15       Q.   Okay.  I'm not going to make you relive that
16  again, but I am gonna -- I think there's been some
17  testimony that you continued saying you were not the
18  shooter after you were shot; is that -- is that correct?
19       A.   Yes, sir.
20       Q.   Okay.  And then when you were shot and fell
21  down, you -- you through the magazine and rifle away; is
22  that right?
23       A.   No, sir.
24       Q.   I think that's all we have for this video.
25  I'm gonna -- do you need to take a break?
```

Jorge MARTINEZ                                          September 7, 2023

Page 30

```
 1                THE WITNESS:   No, I'm good.
 2        Q.   (By Mr. Quast) All right.
 3        A.   I gotta get a tissue.  I'm sorry.
 4        Q.   Do not apologize, sir.
 5                  Are you ready?
 6        A.   Yes, sir.
 7        Q.   All right.  As you were walking down between
 8   the cars and as you walked into the street in front of
 9   the pickup and turned, could you hear any shouting?
10        A.   No, sir.
11        Q.   From the police or anybody else?
12        A.   No, sir.
13        Q.   Okay.  All right.  I'll -- well, I'll just go
14   ahead and ask.  I'll be honest with you, when I first
15   got this case I wondered why -- why you ran out of the
16   house knowing there were police out there, with a rifle
17   in your hand, but -- you can understand that, right?
18        A.   (Witness nods.)
19        Q.   Is that -- is that a yes?
20        A.   Yes, sir.
21        Q.   But on further reflection I understand why you
22   did it, and the reason why you did it was to take the
23   firearm or take the weapon as far away from Mr. Terrazas
24   as possible, right?
25        A.   Yes, sir.
```

ACE COURT REPORTING SERVICE LLC

Jorge MARTINEZ                                    September 7, 2023

Page 31

```
 1        Q.   To keep your mom and your sister safe, right?

 2        A.   Yes, sir.

 3        Q.   And to protect your family?

 4        A.   Yes, sir.

 5        Q.   Okay.  So this is not your fault.  You know,

 6   no one blames you for -- for what happened and I think

 7   you to the right thing.  Do you understand?

 8        A.   Yes, sir.

 9        Q.   All right.

10             MR. QUAST:   I'll pass the witness.

11                      EXAMINATION

12   BY MR. FLORES:

13        Q.   I just have a few questions.  Where -- in

14   Deposition Exhibit Number 28, Mr. Martinez.  The way you

15   circled, the location where you circled where you were

16   gripping it, at any point in time after you exited the

17   home, did the place where you were holding that weapon

18   ever change?

19        A.   The place?

20        Q.   I mean, the way you were holding it, did that

21   ever change?

22        A.   No.

23        Q.   Did you ever point that weapon toward anybody?

24        A.   No.

25        Q.   The barrel remained pointing down the entire
```

ACE COURT REPORTING SERVICE LLC

Jorge MARTINEZ                                    September 7, 2023

Page 32

```
 1   time?
 2        A.    Yes.
 3        Q.    Considering where you were holding that
 4   weapon, could you have in an instant shot that weapon?
 5        A.    No.
 6        Q.    Moments ago you said that you believed you
 7   were turning south towards the truck, correct?
 8        A.    Yes.
 9        Q.    Are you certain about that?
10        A.    From what I saw.
11        Q.    Do you recall doing that?
12        A.    I don't recall doing it.
13        Q.    Did you ever lift that weapon in a way that
14   someone could perceive that you were -- had a desire to
15   use that?
16             MR. QUAST:   Objection, form.
17        A.    No.
18        Q.  (By Mr. Flores) Did the barrel remain down the
19   entire time?
20        A.    Yes.
21        Q.    Did your right hand remain above your head the
22   entire time?
23        A.    Yes.
24             MR. FLORES:   No further -- I'll pass the
25   witness.
```

Jorge MARTINEZ                                    September 7, 2023

Page 33

```
1                        MR. QUAST:   Defendants will reserve any
2          questions, if any, until the time of trial.
3                        THE VIDEOGRAPHER:   The time is
4          10:35 a.m., we're off the record.
5                        (Break taken from 10:35 a
6                        THE VIDEOGRAPHER:   We're on the record,
7          the time is 10:38 a.m.
8                        THE COURT REPORTER:   Do you want to
9          clarify?
10                       MR. QUAST:   Sure.  Just to clarify.  The
11         dash cam video that I was showing Mr. Martinez has
12         prior -- has previously been marked and designated as
13         Deposition Exhibit Number 9, there was confusion about
14         whether it was eight or nine.  We have now clarified
15         it's Deposition Exhibit 9.
16                       THE VIDEOGRAPHER:   The time is
17         10:39 a.m., we're off the record.
18                       (Signature having been not waived, the
19                       deposition was concluded at 10:39 a.m.)
20
21
22
23
24
25
```

ACE COURT REPORTING SERVICE LLC

Jorge MARTINEZ                                    September 7, 2023

Page 34

```
 1
 2            ERRATA SHEET -- CHANGES AND SIGNATURE
 3    PAGE LINE   CHANGE                        REASON
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24
25                          _____
```

Jorge MARTINEZ                                    September 7, 2023

Page 35

```
1                    WITNESS SIGNATURE

2              I, JORGE ROEL MARTINEZ have read the

3    foregoing deposition and hereby affix my signature that

4    same is true and correct, except as noted above.

5

6                         _____

                         JORGE ROEL MARTINEZ
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ACE COURT REPORTING SERVICE LLC

Jorge MARTINEZ                                    September 7, 2023

Page 36

```
 1   THE STATE OF TEXAS          §
 2   COUNTY OF HIDALGO           §
 3                   COURT REPORTER CERTIFICATE
 4               I, CHRISTINA L. SABEDRA, Certified
 5   Shorthand Reporter in and for the State of Texas, do
 6   hereby certify that the facts as stated by me in the
 7   caption hereto are true; that there came before me the
 8   aforementioned named person, who was by me duly sworn to
 9   testify the truth concerning the matters in controversy
10   in this cause; and that the examination was reduced to
11   writing by computer transcription under my supervision;
12   that the deposition is a true record of the testimony
13   given by the witness.
14               I further certify that I am neither attorney
15   or counsel for, related to or employed by, any of the
16   parties to the action in which this deposition is taken,
17   and, further, that I am not a relative or employee of
18   any attorney or counsel employed by the parties hereto,
19   or financially or otherwise interested in the action.
20               Pursuant to Rule 30(e)1:
21               __XX_Reading and Signing was requested.
22               _____Reading and Signing was waived.
23               _____ Reading and signing was not requested.
24
25
```

ACE COURT REPORTING SERVICE LLC

Jorge MARTINEZ                                    September 7, 2023

                                                        Page 37

```
 1                  Given under my hand and seal of office on

 2      this 27th day of September, 2023.

 3

 4      _____
                CHRISTINA L. SABEDRA, CSR
 5              Texas CSR No. 12450
                Exp: 03/31/2025
 6

 7      BUSINESS ADDRESS:

 8      ACE COURT REPORTING SERVICE
        FIRM REGISTRATION NO. 476
 9      220 E. University
        Edinburg, TX  78539
10      Telephone: 956.380.1100
        E-mail: info@acecourtreporting.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**<u>Exhibit D</u>**

(Excerpts from Deposition Transcript of Officer David Hinojosa
taken on May 4, 2023)

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 4

```
 1                      P-R-O-C-E-E-D-I-N-G-S
 2    Whereupon,
 3    1:31 p.m.
 4                    THE VIDEOGRAPHER:  Good morning.
 5                    Today's Thursday's, May 4, 2023.  It's 8:59 in
 6    the morning.
 7                    And we're on the record.
 8                    THE COURT REPORTER:  Okay.  Good morning.
 9                    My name is Patricia Lopez.  Registered
10    Professional Reporter and Texas CSR Number is 11217.
11                    I'll be taking this deposition by stenographic
12    means.
13                    Will all counsel please state your appearances
14    for the record.
15                    MR. FLORES:  David Flores for the plaintiff
16    Jorge Martinez.
17                    MR. QUAST:  Frederick Fritz Quast for the City
18    of Laredo, Texas, and David Hinojosa, defendants.
19                    THE COURT REPORTER:  Thank you.
20                    And Mr. Hinojosa, will you please raise your
21    right hand to be sworn in.
22                    (The witness was sworn.)
23                    THE COURT REPORTER:  Thank you.
24                    Counsel you may begin.
25    ///
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

                                                              Page 65

```
 1        A.    Possibly.

 2        Q.    Would you -- would there be documentation of the

 3   prior days that you trained him?

 4        A.    Yes, sir.

 5        Q.    Okay.  But this date, you didn't document anything.

 6   Any documentation that came, would have come the day after this

 7   incident?

 8        A.    It would have been --

 9                    (Simultaneously speaking.)

10        Q.    By somebody else?

11        A.    It would have been Officer Garcia.  He would have

12   documented everything.

13        Q.    And when you Officer Garcia, are you referring to

14   Johnny Garcia?

15        A.    Yes, sir.

16        Q.    And who is he?

17        A.    He's -- he's also a field training officer that was

18   in my squad.  I was the senior officer.  He's the -- he's one

19   -- next underneath me.

20        Q.    And how long had he been with the Laredo Police

21   Department at this time?

22        A.    Over 25.

23        Q.    Okay.  Now, how did you become aware of the incident

24   at 127 Knoll?

25        A.    Over the radio.
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 68

```
 1        Q.    Something minor to something major?

 2        A.    Yes, sir.

 3        Q.    So if it's not in your district, why then are you

 4   asking Officer Gonzalez to start heading that way?

 5        A.    Because, to back up the officers.  To assist.  Just

 6   in case they need assist.

 7        Q.    Okay.  So anytime you get -- you hear a calling over

 8   the radio asking officers to arrive in an area you're not

 9   assigned to, you will start heading that way to what?

10        A.    To assist.

11        Q.    To assist.  And that's --

12        A.    We're allowed to do that, yes.

13        Q.    You're allowed to do that.  Are you required to do

14   that?

15        A.    We're supposed to assist, so we go assist.  It

16   doesn't -- this is how we worked as a -- as a -- as a group.

17   My squad.  We go assist each other.

18        Q.    So they were within your same squad?

19        A.    Yes, sir.

20        Q.    Cabello --

21              (Simultaneously speaking.)

22        A.    Yes, sir.

23        Q.    -- and Benavides?

24        A.    Yes, sir.

25        Q.    And so, anytime anyone from your squad gets a call,
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

1   Q.   Now, after you receive the subject disturbing call,

2   and you ask Officer Gonzalez to start heading that was, are you

3   giving him -- as his field training officer, are you giving him

4   any instruction or direction?

5   A.   He -- he knows how -- he knew -- he knews[sic] how --

6   he know[sic] how to get there.

7   Q.   I'm not talking directions, how to get there.

8   A.   Yeah.

9   Q.   I'm talking about are you, as an officer, giving him

10  instruction what he should be expecting or doing as a police

11  officer?

12  A.   That I can recall, no.  To the effect, he was a prior

13  -- he's prior law enforcement from another agency.  So we're

14  going -- we're going that way.  And to the effect, it was

15  already -- it late at night.  It was early in the morning.

16  Q.   Mm-hmm.

17  A.   So we were going that way.

18  Q.   And so, your testimony is, because he had prior law

19  enforcement experience, you didn't feel the need to have to

20  give him any additional --

21                  (Simultaneously speaking.)

22  A.   Not at the time.

23  Q.   -- instruction or --

24  A.   Not at the time.

25  Q.   -- advice?  Okay.  So while in route there, then you

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 72

```
 1    the -- at 127 Knoll?

 2         A.    We were already on Delmar Street -- Boulevard, so

 3    less than a mile maybe.

 4         Q.    Okay.  So at that point in time, once you hear the

 5    "shots fired" call, what are you --

 6               (Simultaneously speaking.)

 7         A.    I'm telling the officer what's to be expected.  What,

 8    you know, what -- what to look out for.

 9         Q.    Okay.  What specifically do you tell him?

10         A.    To be careful if we're gonna go -- we're gonna go

11    there.  If we're gonna -- we have know no idea what's there

12    yet.  So we're not -- just expect anything when we get there.

13         Q.    So --

14               (Simultaneously speaking.)

15         A.    Follow my lead, basically.

16         Q.    Now, at this point in time, how is Officer Gonzalez

17    responding?  What's his demeanor?

18         A.    Well, um --

19         Q.    Is he calm?

20         A.    Yes.

21         Q.    What's your demeanor at this point?

22         A.    Calm.

23         Q.    Okay.  Do you think that's important?

24         A.    Yes.

25         Q.    Why?
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 84

```
 1        A.   Okay.  We're blocking so no one can go near it.  Near
 2   the residence and stuff, so we have eyes down the -- on the
 3   back of the house, on the front of the house, the side of the
 4   house.
 5        Q.   And so, in that situation, S.W.A.T. gets there, they
 6   make entry, they detain him.  Was he injured?
 7        A.   No.
 8        Q.   Okay.  Other than that, any other active shooter
 9   responses that you were involved in?
10        A.   No.  It turned into an active shooter, it wasn't --
11   it turned into an active shooter?
12        Q.   This one here?
13        A.   Yes.
14        Q.   Any other situation that turned into an active
15   shooter?
16        A.   No.
17        Q.   Okay.  So, back to the incident that we're here on
18   today --
19                  (Simultaneously speaking.)
20        A.   Okay.
21        Q.   -- Officer Hinojosa, you then hear Officer Whitehawk
22   or Cabello yell "shots fired" and he yells "78"?
23        A.   Yes.
24        Q.   What next?
25        A.   Like I said, I'm not sure about the "78".  I don't
```

```
1    positioned when you arrive?

2        A.    We're positioned on Knoll and the Villa...

3        Q.    Villastrigo?

4        A.    Yes.

5        Q.    So, there's an intersection there?

6        A.    Yes.

7        Q.    And so, you're at -- you position your vehicle at the

8    intersection on Knoll and Villastrigo?

9        A.    Yes, sir.

10       Q.    I'm going to show you, Officer Hinojosa, what was

11   previously marked as -- here put this -- put that to that side

12   -- what was previously marked as Deposition Exhibit Number 4.

13                   (Deposition Exhibit Number 4 marked for

14                    identification)

15       Q.    (BY MR. FLORES)  And during the deposition of

16   Officer Gonzalez, I asked him to mark on this deposition

17   exhibit where he believes your unit was at.

18       A.    Mm-hmm.

19       Q.    And he put that, and he marked that with a V; do you

20   see that?

21       A.    Yes.

22       Q.    Is that where you believe your vehicle was positioned

23   when you arrived at the scene?

24       A.    Yes, sir.

25       Q.    That's accurate?
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 87

```
 1        A.    Approximately.
 2        Q.    Okay.  Okay.  Good.  So then you get there, what are
 3   you telling, or what's going on between you and
 4   Officer Gonzalez at this time?
 5        A.    We get there and we hear the shots fired.  We hear
 6   shooting.
 7        Q.    Okay.
 8        A.    I told him to get his rifle.  Get his AR, and get
 9   open the trunk, because mine's in the trunk.
10        Q.    Where's his rifle?
11        A.    Right beside us.
12        Q.    Okay.  So there's -- sometimes in the -- your unit,
13   you have a rifle --
14              (Simultaneously speaking.)
15        A.    There's --
16        Q.    -- in the front seat, correct?
17        A.    Yes.  That's his rifle.
18        Q.    Okay.  And then you're is in the trunk?
19        A.    Yes, sir.
20        Q.    You tell him --
21        A.    "Pop the trunk."
22        Q.    Okay.  Then you go get your rifle, right?
23        A.    Yes, sir.
24        Q.    So as you get there you said you heard shots fired?
25        A.    Yes, sir.
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 88

```
 1        Q.    How many shots can you hear being fired as you get
 2   there?
 3        A.    When we get there we heard about three maybe four.
 4        Q.    Okay.
 5        A.    Approximately.
 6        Q.    And who is taking those shots?
 7        A.    Whoever -- who's shooting at us, or what?
 8        Q.    Yes.
 9        A.    The -- whoever the shooter is.
10        Q.    That was Cesar Terrazas; was he taking those shots?
11        A.    If he's the, yes.
12        Q.    Well, you've learned --
13        A.    I learned it was him, yes.
14        Q.    Okay.  So it was Cesar Terrazas who was taking those
15   shots, you believe?
16        A.    Yes.
17        Q.    Okay.  How do you know that they were being fired in
18   -- in what direction are they shooting?
19        A.    They're shooting south, so we were facing north.
20        Q.    So they're coming in your direction?
21        A.    Yes, sir.
22        Q.    And how do you know that?
23        A.    We -- we heard them.
24        Q.    Okay.  You get there, you hear shots fired, right?
25        A.    Yes, sir.
```

1      A.   Yes, sir.

2      Q.   Okay.  So as you get there, shots fired.  You go to

3    the back.  You ask Gonzalez to open the trunk?

4      A.   Yes.

5      Q.   He had the keys?

6      A.   No.  It's a push button.

7      Q.   Ah.  So why didn't you push the button?

8      A.   I mean, cause it's in the trunk.  It's in the -- it's

9    in the -- it's in the car.

10      Q.   Oh.  And it's on his side of the car?

11      A.   It's in the middle.

12      Q.   Oh.

13      A.   So as he was grabbing his weapon -- and it's right

14    there.  So he --

15              (Simultaneously speaking.)

16      Q.   Oh.  And you're running out --

17      A.   I'm running.

18      Q.   -- to get your gun --  push it so you --

19      A.   Yeah.

20      Q.   Okay.  That's makes sense.  So you -- shots are

21    fired, you go to the back, and are getting your weapon,

22    correct?

23      A.   Yes, sir.

24      Q.   Now, can you see officer Cabello and

25    Officer Benavides?

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 97

```
 1        Q.   Did you ever meet with Internal Affairs as it
 2   pertains to this incident?
 3        A.   No.
 4        Q.   You were never interviewed by Internal Affairs?
 5        A.   My statement was sent to Internal Affairs.
 6        Q.   Did you meet with any of -- anybody of the Laredo
 7   Police Department, not Internal Affairs, pertaining to this
 8   incident?
 9        A.   No.  Other than -- I was there with Mr. Morris, along
10   with Cabello, along with Benavides.  We were there doing out
11   statements.
12        Q.   What do you mean by that?
13        A.   We were at the police department.  He came in and
14   each of us were in different cubicles doing our statements.
15        Q.   When was that?
16        A.   A couple of days after.
17        Q.   And is that the same time you saw that other video?
18        A.   Yes.
19        Q.   So, it is your testimony then that, you've seen --
20   the only videos you've seen, ever, related to this incident was
21   the video you saw with your attorney two days after the
22   incident and your body cam video that you saw today?
23        A.   Yes.
24        Q.   That's the only two times you've seen any video about
25   this incident?
```

```
 1        A.   Yes.

 2        Q.   Okay.  So you've got your weapon.  You start -- once

 3   you get your weapon --

 4                  (Simultaneously speaking.)

 5        A.   Yes, sir.

 6        Q.   What do you do after that?

 7        A.   I start -- I start on the -- on the east side of the

 8   -- walking up the east side of the road.

 9        Q.   Okay.  And as you're approaching or walking, where

10   are you going?

11        A.   I'm -- I'm going to 127 Knoll.

12        Q.   And why?

13        A.   That's where the -- that's where the calls at.

14        Q.   Okay.  You hear that there was gunshots coming from

15   that direction, or you there was gunshots coming from that

16   direction, correct?

17        A.   Yes.

18        Q.   And you're approaching that -- where those gunshots

19   are coming from?

20        A.   Yes, sir.

21        Q.   Okay.  Would it be accurate to describe you as

22   approaching tact -- you know --tact --

23        A.   Tactfully.

24        Q.   Tactful?  Is that the proper word?  I don't --

25        A.   Yes.
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 100

```
 1        Q.    Okay.  And so, while you're tactfully approaching,
 2   what is Officer Gonzalez doing?
 3        A.    I'm not sure.  Should be doing the same thing, but
 4   I'm not sure.  I couldn't see him.  It's just the -- the
 5   darkness.
 6        Q.    You're not looking out for him, seeing what he's
 7   doing?
 8        A.    I'm looking at him -- I'm looking for him, but I
 9   can't see him.
10        Q.    Okay.
11        A.    It's just -- because of the darkness.
12        Q.    Okay.  And what about Officer Ibarra?
13        A.    He should be behind me.  I don't know what he's
14   doing.
15        Q.    Why should he be behind you?
16        A.    Because he didn't pass me.
17        Q.    Oh, I see.  You -- you -- not that he's -- by tactic.
18   You're saying, because you didn't see him, you believe him to
19   be behind --
20        A.    Be behind me.
21        Q.    Okay.
22        A.    Yes.
23        Q.    As you're approaching are shots continuing to be
24   fired?
25        A.    That I can recall, I don't think so.
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 101

```
 1        Q.   So shots have stopped?

 2        A.   Yes, sir.

 3        Q.   Is it quiet?

 4        A.   Yes, sir.

 5        Q.   So you're approaching, and you're moving tactfully

 6   closer to 127 Knoll, correct?

 7        A.   Yes, sir.

 8        Q.   You don't know what Gonzalez is doing cause you can't

 9   see him?

10        A.   Yes, sir.

11        Q.   You believe Ibarra's behind you?

12        A.   Yes, sir.

13        Q.   No shots are being fired, and you're tactfully moving

14   forward?

15        A.   Yes, sir.

16        Q.   It's quiet.  Can you hear anything at that point?

17        A.   No, sir.

18        Q.   Okay.  So then, did you eventually come to a final

19   position?

20        A.   Yes, sir.

21        Q.   Okay.  And where was your final position?  And, when

22   we refer to final position, I want to refer to the position you

23   were in when you shot Jorge Martinez, okay?

24        A.   Yes, sir.

25        Q.   Where was your final position?
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 102

```
 1         A.    At 121 Knoll.
 2         Q.    Now, if you look at Deposition Exhibit Number 4, can
 3    you mark with an X what your final position was at when you
 4    took the shot at Jorge Martinez.
 5               Can you circle that as well, please?
 6         A.    I think.  No, that's wrong.
 7         Q.    Okay?
 8         A.    It's not there -- it's further back.
 9         Q.    Is it whether there is an N?
10         A.    It's somewhere around that area, yes.
11         Q.    Okay.
12         A.    It's -- but I'm more over here.
13         Q.    Okay.
14         A.    Probably where the M is, yes.
15         Q.    Okay.  Why don't you put a star where you believe to
16    be?
17         A.    About right there.
18         Q.    Okay.  And -- and for the purposes of the deposition
19    transcript, you have put a star right next to where
20    Officer Gonzalez marked and X -- an H, excuse me, right?
21         A.    Yes.
22         Q.    And it's somewhere south of where you had initially
23    the X --
24               (Simultaneously speaking.)
25         A.    Yes.
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

```
 1        Q.    -- with a circle?

 2        A.    Yes.  Yes.

 3        Q.    And it's actually further -- just a bit further to

 4   the east?

 5        A.    Yes, sir.

 6        Q.    Okay.  And that is in front of 121 Knoll?

 7        A.    Yes, sir.

 8        Q.    Okay.

 9        A.    I got the trees mixed up, is all.

10        Q.    Okay.  I understand.  And so, explain to the jury how

11   are you positioned at this -- once you get to that point, how

12   are you positioned?

13        A.    I'm on one knee.  I'm kneeling down.

14        Q.    And you're holding a weapon?

15        A.    Yes, sir.

16        Q.    And how are you holding the weapon?

17        A.    At the ready.

18        Q.    Okay.  Explain to the jury what the ready is?

19        A.    Holding it in your hands like this. (Indicating) Not

20   aiming it at anybody or holding --

21        Q.    Okay.

22        A.    So if you have to, you just bring it up.

23        Q.    Okay.  Officer Gonzalez said where he was in his

24   final position, he was actually holding the weapon pointing it

25   towards Mr. Martinez as he's exits the home, and is walking
```

ACE COURT REPORTING SERVICE                    Office: (956) 380-1100
& Digital Videography                          Fax: (866) 380-1135

1    towards the street?

2        A.    Mm-hmm.

3        Q.    Is that not the ready position?

4        A.    No.  He's pointing.  The ready is ready like this

5    (Indicating).  You're ready.

6        Q.    So there's --

7                    (Simultaneously speaking.)

8        A.    You're ready to come up.

9        Q.    So there's a difference between ready and pointing?

10       A.    Yes.

11       Q.    What he was doing was the pointing position; is that

12   an accurate way to describe it?

13       A.    Yes, sir.

14       Q.    You're not pointing?

15       A.    No.  I didn't see him at that time.

16       Q.    You weren't?

17       A.    No.  At that time, no.

18       Q.    Okay.  So you get there, and you take a knee, and

19   you're in your ready position ready to fire your weapon if

20   necessary?

21       A.    Yes, sir.

22       Q.    Okay.  Once you're there, explain to the jury what

23   you can see?

24       A.    I can see what looks like 120 -- 127 Knoll, because

25   the lights were outside.

```
 1        Q.   To your left or to the west?

 2        A.   To the west.  To my left.

 3        Q.   Okay.  And is he -- do you believe him to be parallel

 4   to you?

 5        A.   Yes, sir.

 6        Q.   Okay.  And Officer Ibarra, do you know where he's at?

 7        A.   Somewhere behind me.

 8        Q.   Okay.  Were there any other officers present at that

 9   time?

10        A.   That I could see, no.

11        Q.   Okay.  So you don't see anybody outside or near

12   127 Knoll?

13        A.   No, sir.

14        Q.   You don't see Cesar Terrazas?

15        A.   No, sir.

16        Q.   At this point in time is he inside the house already?

17        A.   I have no idea.

18        Q.   Do -- have you learned since this incident that he

19   was inside the house at some point?

20        A.   Yes, sir.

21        Q.   And he shot someone inside that house?

22        A.   Yes.

23        Q.   When he was inside that house, he shot Elizabeth

24   Perez, correct?

25        A.   I don't -- he shot a -- the mother, but I just --
```

```
 1   it down.
 2        Q.   And, he's holding -- is it in his right hand or left
 3   hand?
 4        A.   Right hand.
 5        Q.   And he's grip -- he's holding it from the stock of
 6   the --
 7        A.   I can't tell.
 8        Q.   Okay.  So, you've describe it's to his right?
 9        A.   Yes, sir.
10        Q.   And it's -- and he's holding it to his right?
11        A.   Yes, sir.
12        Q.   With the barrel pointing straight down?
13        A.   Yes, sir.
14        Q.   Okay.  What else do you see?
15        A.   Then he's walking -- he's walking north to the -- to
16   the driveway.
17        Q.   Okay.
18        A.   He turns into the driveway in between the cars.  And
19   I lose him right there.  I lose him in between the cars.
20        Q.   Okay.
21        A.   And the he -- he's -- he walks towards the street,
22   and he comes out in the street.
23        Q.   Okay.  As he -- when do you regain visual on --
24   visual?
25        A.   When steps into the street.
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 115

```
 1        A.   No, sir.

 2        Q.   Did your warn him that you were going to shoot him?

 3        A.   No, sir.

 4        Q.   Can you explain to the jury why not?

 5        A.   I don't think he would have heard me.  I was too far

 6   away.

 7        Q.   You don't think he would have heard you?

 8        A.   No, sir.

 9        Q.   You were too far away?

10        A.   Yes, sir.

11        Q.   Now, when he's coming out, he's enters the street,

12   turns north and then turns south, do you see anybody else

13   present in the vicinity?

14        A.   No, sir.

15        Q.   Are there any other officers that are near

16   Mr. Martinez?

17        A.   That I could see, no.

18        Q.   Okay.  Now, as he's coming out, do you hear him say

19   anything?

20        A.   No, sir.

21        Q.   Do your hear him yelling?

22        A.   No, sir.

23        Q.   You don't hear anything?

24        A.   No, sir.

25        Q.   Okay.  You gave -- you alerted the other officers
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 116

```
 1   present to the fact that he was naked?
 2        A.   Yes, sir.
 3        Q.   And to the fact that he's carrying a 32?
 4        A.   Yes, sir.
 5        Q.   You can't see any other officers, however?
 6        A.   No, sir.
 7        Q.   But you still alerted them?
 8        A.   Yes, sir.
 9        Q.   Why?
10        A.   Because, it doesn't mean that I don't see them, that
11   they're not there.  And plus I'm alerting Officer Gonzalez and
12   Officer Ibarra.
13        Q.   So, I asked you just moments ago why didn't you
14   command him to drop the weapon, or give him order and you said,
15   "I didn't think he'd hear me."
16        A.   Yes.  I didn't think he would -- he heard -- I think
17   I was too far.  And do to the fact that he turned and that
18   weapon moved, it --
19        Q.   What to do you mean by that weapon -- explain to the
20   jury exactly what you mean.  How did the weapon move?
21        A.   It -- to me it looked like it was coming up.  It
22   moved -- so you're turning around, it -- it moved, and in my --
23   what it looked like to me, it was gonna --  it's coming up.
24        Q.   But, how far -- let the jury know how far up do you
25   believe he brought that gun?
```

A. Like I said, he turned around to the south.
Q. Mm-hmm.
A. He turned -- he turned around (Indicating). And when turned -- I'm not sure if he turned the other way -- but that weapon moved. So, I don't know if it moved with his hand, or it moved -- could have come up immediately.
Q. You're only describing, here, a few inches; is that pretty accurate?
A. Correct.
Q. But you shot, and you don't give a warning. You were able to give a warning but you didn't; is that true?
A. Correct.
Q. Correct?
A. Yes.
Q. And the reason is cause you said earlier, "I don't think he would have heard me."
A. Yes.
Q. Cause you were too far away?
A. Yes.
Q. Now, let's go back to -- I'll give this to you here.
A. What?
Q. Do I have it? Oh, Deposition Exhibit Number 12? Go ahead and grab it. Let's start at the top, please.
We've been going for about two hours now, Mr. Hinojosa. Do you need a break?

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 119

```
 1        A.   No.

 2        Q.   You didn't do a handwritten statement?

 3        A.   That I can recall, I don't think so.

 4        Q.   Okay.  So let skip to the top of your statement that

 5   states, "On Tuesday, November 26, 2019, at approximately 5:42

 6   hours a call came in from 127 Knoll for a subject disturbing

 7   District 20."  Did I read?

 8        A.   Yes, sir.

 9        Q.   Okay.  You were in District 14, correct?  As you --

10             (Simultaneously speaking.)

11        A.   Correct.

12        Q.   Okay.  "Officer Antonio Cabello", is that Whitehawk?

13        A.   Yes, sir.

14        Q.   Is Whitehawk a nickname, or is that a real name?

15        A.   That's his name.

16        Q.   What's his last name?

17        A.   Cabello.

18        Q.   Is that -- Whitehawk's his mother's last name?

19        A.   No.  It's his Indian name.

20        Q.   Oh, okay.  I guess we'll figure that out when we talk

21   to Officer Whitehawk.

22             "And Officer Eduardo Benavides were dispatched

23   to the call.  My probationary police officer, Gabriel Gonzalez,

24   and myself, field training officer David Hinojosa, Junior, went

25   to assist Officers Cabello and Benavides."  And that's
```

 1    work?

 2         A.    I can turn it on and turn it off.

 3         Q.    Okay.  It doesn't come on automatically if you get

 4    out of the unit?

 5         A.    Yes.  If you have the light on, yes, it automatically

 6    turns on.

 7         Q.    So if you don't have the -- and when you say the

 8    lights, you mean the overhead lights?

 9         A.    The overheads, yes.

10         Q.    Okay.  So if you have your overhead lights on, and

11    you exit your patrol unit, your body cam should come on?

12         A.    Should come on, yes.

13         Q.    Can you turn it off?

14         A.    Yes.

15         Q.    "We can hear shots being fired down the street.  It

16    was dark, and the only lighting was from the outside lights

17    that were on from the houses along Knoll."

18               Now, you testified earlier that there was a

19    light outside of Knoll.  A streetlight.

20         A.    Mm-hmm.

21         Q.    And then the light from the garage.

22         A.    Yes.

23         Q.    Did that give you adequate visual of the plaintiff

24    here, Jorge Martinez?

25         A.    Yes, sir.

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 124

```
 1    relaying information talking to the officers.  Does everybody

 2    get that same information?

 3         A.   Yes.

 4         Q.   How does that work?

 5         A.   It's broadcast over the radio.

 6         Q.   And so you don't have to be on a certain channel.

 7         A.   You should be on channel one.  Like, we're always on

 8    channel one.

 9         Q.   Can you change it?

10         A.   Yes.

11         Q.   How?

12         A.   With the dial.  You change it to channel one, channel

13    two.

14         Q.   So -- but, are you instructed or trained to keep your

15    -- your radio, that's on your please person on channel one?

16         A.   Yes.

17         Q.   And why is that, do you believe?

18         A.   Because that the primary unit.  That's the primary

19    channel.

20         Q.   So if there was information being relayed to the off

21    -- responding officers on the night of this incident, it would

22    have been coming through channel one?

23         A.   Correct.

24         Q.   So you knew it was important to stay on channel one?

25         A.   Yes.
```

```
 1        Q.    Did you ever hear a description of what the shooter
 2   was wearing through your radio?
 3        A.    No.
 4        Q.    Have you had an opportunity to review these
 5   communications -- radio communications either through a video
 6   or body cam?
 7        A.    Just the body cam this morning.
 8        Q.    The body -- your body cam?
 9        A.    Yes.
10        Q.    And on your body cam, you didn't hear that?
11        A.    No, sir.
12        Q.    Okay.  "I then saw a totally nude male subject
13   carrying what appeared to be a rifle in his right hand with the
14   barrel hanging down."  Read that correctly?
15        A.    That's correct.
16        Q.    How do you know he was carrying it in his right hand?
17        A.    Because you can see.
18        Q.    You could see good enough that --
19                   (Simultaneously speaking.)
20        A.    That he was grabbing it.
21        Q.    -- that he was carrying it to his side?
22        A.    Yes, sir.
23        Q.    Okay.  With one hand?
24        A.    Yes, sir.
25        Q.    Did he appear to you that he was holding it from the
```

```
 1   residence three house down from where I was at.  I yelled to

 2   the other officers in the area that there was a nude male

 3   subject with a rifle."  Correct?

 4        A.   Yes.

 5        Q.   "As the nude male came out of the residence carrying

 6   the rifle, he walked down the driveway in between two vehicles,

 7   and then walked into the street?

 8        A.   Correct.

 9        Q.   Where was he at when you yelled to the other officers

10   that he was nude, and that -- what you said was he's carrying a

11   32; am I correct?

12        A.   Correct.

13        Q.   What is 32?

14        A.   Weapon.

15        Q.   Okay.  So where was Mr. Martinez at when you alert

16   the other officers that he's naked, and that he's carrying a

17   32.

18        A.   He was walking -- started walking between the -- the

19   vehicles.

20        Q.   Then he gets to the street?

21        A.   Correct.

22        Q.   So you had ample opportunity to have issued a command

23   to throw the weapon, true.

24        A.   Correct.  I didn't see him after that.  I lost visual

25   of him.
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 128

```
 1        Q.    But he's holding -- you already know that he's
 2   weapon?
 3        A.    Yes, sir.
 4        Q.    So you had ample opportunity to have instructed him
 5   to throw the weapon down, or get rid of the weapon, true?
 6        A.    True.
 7        Q.    "The nude male was facing north on Knoll.  Knowing
 8   that Officer Cabello had been shot in my mind, as the nude male
 9   was turning around and was facing south in my direction,
10   fearing for my safety and the safety of other officers and the
11   public in the area, I fired my long rifle hitting the subject
12   knocking him down to the ground."  Did I read that correctly?
13        A.    That's correct.
14        Q.    So, he was -- he comes out, he hits the street, and
15   he turns to his right, which is north?
16        A.    Yes.
17        Q.    Which is away from you?
18        A.    Yes.
19        Q.    Then, according to this, you're saying he turns all
20   the way south?
21        A.    Yes, sir.
22        Q.    Facing you?
23        A.    Yes, sir.
24        Q.    And that's when you took the shot at him?
25        A.    Yes, sir.
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 131

```
 1    more over here (Indicating).  If this is -- if this is
 2    127 Knoll, he's right here somewhere.
 3         Q.    Can you mark with an X where you believe that
 4    Jorge Martinez was at standing when you shot him?
 5         A.    Approximately, right here.  Approximately.
 6         Q.    Okay.  Circle that, please.
 7                    (Witness complies)
 8         Q.    (BY MR. FLORES)  Okay.  And so, you don't deny,
 9    however, that that is Mr. Martinez's blood?
10         A.    Yes, it should be.
11         Q.    Okay.  So, after you shot him, did he walk a
12    distance?
13         A.    I shot him.  As soon as he fell, I commanded him -- I
14    was yelling at him not to be moving, and he was moving.
15         Q.    You're not only yelling at him not to be moving, you
16    were threatening him that if he continued moving you'd shoot
17    him again.
18         A.    Shoot him, because that weapon, when he went down,
19    that weapon's around here somewhere.  I thought he was going
20    after the weapon.
21         Q.    Did you see, as you approached him, that there was a
22    magazine that was away from the weapon?
23         A.    No.
24         Q.    When did you realize that the magazine was not in the
25    weapon?
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 132

```
 1        A.    I didn't know the magazine was not in the weapon.
 2        Q.    Do you know who removed the magazine from the weapon?
 3        A.    No.
 4        Q.    Has anyone told you who they believe removed the
 5   magazine from the weapon?
 6        A.    No.
 7        Q.    Do you agree that, at the time that Martinez was
 8   shot, the magazine was not in the weapon?
 9        A.    Like I said, I did not -- I saw the weapon, but I
10   can't recall if the magazine was in or not.  It was dark.
11        Q.    So you don't know when the magazine was removed?
12        A.    Correct.
13        Q.    Do you think it could have been removed after you
14   shot him?
15        A.    Could have.  When the -- when the weapon fell it --
16   it dislodged, or I don't know what --
17        Q.    Did you ever ask anybody?
18        A.    No, sir.
19        Q.    Okay.  Now, after you shoot him, who was the first to
20   reach the -- Mr. Martinez?
21        A.    I don't recall which officer.  I don't remember.
22        Q.    Now, when you took the shot at Mr. Martinez --
23        A.    Mm-hmm.
24        Q.    -- were there officers opposite of him?
25        A.    Possibly, yes.
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 139

```
 1          A.    Mm-hmm.  Right now, I didn't hear it?

 2          Q.    Okay.  Well -- well let's go back just a bit.  If you

 3    need to get closer, do so.

 4          A.    That's fine.

 5                (Video playing.)

 6          Q.    (BY MR. FLORES)  I don't think I went back far enough

 7    this time.  Let me go -- my mistake.  I apologize.  Let me try

 8    that again.

 9                (Video playing.)

10          Q.    (BY MR. FLORES)  Did you hear that?

11          A.    Yes.

12          Q.    What did she say?

13          A.    I think she said the suspect or the defendant wearing

14    all black.

15          Q.    Okay.

16          A.    I wasn't sure about the first thing she said.

17          Q.    Okay.  Time so there was a description that was

18    communicated to all the officers that were present there that

19    night, correct?

20          A.    Yes, sir.

21          Q.    And that was communicated, you believe, through the

22    channel that you had on?

23          A.    Yes.

24          Q.    But you're telling this jury that you didn't hear

25    that because you had turned that down?
```

Oral/Video Deposition of David Hinojosa                    Taken May 4, 2023

Page 140

```
 1        A.    Yes, sir.
 2        Q.    Are you supposed to turn that down?
 3        A.    My -- my radio was beeping.  It was --
 4              (Simultaneously speaking.)
 5        Q.    Which -- which means what?
 6        A.    Which means that the battery's about to die.  So I
 7   lowered it so it wouldn't give my position away.
 8        Q.    And does the department have policy on being able to
 9   receive communications from dispatch?
10        A.    I think so.  They should -- they should have, yes.
11        Q.    Was it in violation of the department policy for you
12   to have turned down that communication?
13        A.    If I was in violation, I would have been in
14   violation.  But due to the fact that it was beeping and giving
15   my position away, the circumstances present -- that I turned it
16   if down.
17        Q.    And you're say that it was beeping because it wasn't
18   charge?
19        A.    The battery was about to die, yes.
20        Q.    How do you charge those?
21        A.    We charge them at home.
22        Q.    And how long should a charge last?
23        A.    It depends.  I let my batteries drain.  It can take a
24   couple of days until I -- until I -- I recharge it?
25        Q.    Is that a smart thing to do in your opinion?
```

```
 1        A.   Yes.

 2        Q.   Why so?

 3        A.   Because if you -- if you keep charging your battery

 4   -- you do a shift and you put it to charge, all you're doing is

 5   causing the memory on that battery.  So that battery is not

 6   going to be a full complete battery.  It's going to get used to

 7   being charged.  No matter how long you've used it, it's going

 8   to be use -- it's going to get -- it's going to get a memory

 9   that's -- it's not going to go that much.  And then it's going

10   to die.

11        Q.   So, back to the video.

12        A.   Yes.

13                  (Video playing.)

14        Q.   (BY MR. FLORES)  Now, she says all black a second

15   time, correct?

16        A.   Mm-hmm.

17                  (Video playing.)

18        Q.   (BY MR. FLORES)  Now, here in moments you're going to

19   see Mr. Martinez come onto the screen, where he's walking out

20   of his home.

21        A.   Okay.

22        Q.   He's going to appear and I'm going to show you in

23   this general area, okay?

24        A.   Okay.

25        Q.   Be looking out.
```

1                      CHANGES AND SIGNATURE

2    WITNESS:   DAVID HINOJOSA              DEPO DATE:   MAY 4, 2023

3    PAGE LINE   CHANGE                     REASON

4    55   7    Killed 3 people             3o was placed.

5    91   20   We were Beside Ibarra       The correct ~~position~~ position
                                           of our unit.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    _Gil Henryz_

23    DAVID HINOJOSA

24

25

1           S I G N A T U R E   O F   W I T N E S S

2                I, DAVID HINOJOSA, have read the foregoing

3     deposition and hereby affix my signature that same is true and

4     correct, except as noted above

5                                    _Daril Hend_____

6                                    DAVID HINOJOSA

7

8

9     THE STATE OF ____Texas_____ )

10    COUNTY OF ____Webb_____ )

11                     BEFORE me, _Endeth Salas_____, on

12    this day personally appeared DAVID HINOJOSA, known to me or

13    proved to me on the oath of _David Hinojosa_ or through

14    _Driver License_____ (description of identity card or

15    other document) to be the person whose name is subscribed to

16    the foregoing instrument and acknowledged to me that he/she

17    executed the same for the purpose and consideration therein

18    expressed.

19                Given under my hand and seal of office on this

20    _12_ day of _July_____, _2023_.

21

22                                    _____

23    ╔══════════════════════╗        NOTARY PUBLIC IN AND FOR
      ║  ENEDETH SALAS       ║
      ║  Notary ID #126700435║        THE STATE OF TEXAS
24    ║  My Commission Expires║       My commission Expires: _11/10/2024_
      ║  November 10, 2024   ║
      ╚══════════════════════╝

25

ACE COURT REPORTING SERVICE                        Office: (956) 380-1100

**<u>Exhibit E</u>**

(Voluntary Statement Form of Officer David Hinojosa
dated December 5, 2019)

# LAREDO POLICE DEPARTMENT
## VOLUNTARY STATEMENT FORM

I, _Officer David Hinojosa Jr_ , AM MAKING THIS STATEMENT AT

_4712 Maher_ AS A ☐ REPORTING PARTY

☐ VICTIM ☒ WITNESS, ON VOLUNTARY BASIS BEFORE _Inv. Carmona_

IN THIS _5_ DAY OF _December_ 20 _19_ AT _10 AM_

O'CLOCK IN LAREDO, WEBB COUNTY TEXAS.

MY NAME IS _Officer David Hinojosa J._

MY ADDRESS IS _4712 Maher_ IN _Laredo_
(CITY)

_Webb_ _Tx_ MY DATE OF BIRTH IS _7-1-67_ AND MY PRESENT
(COUNTY) (STATE)

AGE IS _52_ MY HOME TELEPHONE IS _956 795 2800_ I AM EMPLOYED

BY _Laredo Police Dep't_ IN THE CAPACITY OF _Police Officer_

MY BUSINESS PHONE NUMBER IS _956·795-2800_ ;

THIS STATEMENT IS IN REFERENCE TO:

## DETAILS OF STATEMENT

See ATTACHMENT

On Tuesday, November 26, 2019 at approximately 0542 hrs, a call came in from 127 Knoll for a subject disturbing in District 20. Officer Antonio Cabello and Officer Eduardo Benavides were dispatched to the call. My Probationary Police Officer Gabriel Gonzalez, and myself, Field Training Officer David Hinojosa, Jr., went to assist officers Cabello and Benavides.

On our way to the location, Officer Cabello stated shots fired over the radio. A few minutes later, Officer Cabello stated over the radio that he had been shot in the leg. Officer Gonzalez and I were the 4th unit to arrive at the scene. When we arrived, we stopped at the south end of the 100 block of Knoll near the intersection of Knoll and Villastrigo St. We both got off the patrol vehicle, and my body camera came on. We could hear shots being fired down the street. It was dark and the only lighting was from the outside lights there were on from the houses along Knoll. I advised Officer Gonzalez to get his long rifle and to open the trunk of the patrol car so I could retrieve my long rifle.

I then eased my way on the east side of Knoll, which is the same side of the street of 127 Knoll (disturbance was at) and continued to move in the direction where I heard the shots coming from. When I reached 121 Knoll, I went into a kneeling position next to a tree for cover while I scanned the area for the shooter. I could still hear shots being fired. There was no description of what the subject was wearing that I could recall. I then saw a totally nude male subject carrying what appeared to be a rifle in his right hand with the barrel hanging down. I could see the male because of the front porch light of 127 Knoll near him. The lighting was still very dim all around 127 Knoll. The nude male had come out of a residence three houses down from where I was at. I yelled to the other officers in the area that there was a nude male subject with a rifle. As the nude male came out of the residence carrying the rifle, he walked down the driveway in between two vehicles and then walked into the street. The nude male was facing North on Knoll. Knowing that Officer Cabello had been shot in my mind, as the nude male was turning around and was facing south in my direction, fearing for my safety and the safety of other officers and the public in the area, I fired my long rifle hitting the subject knocking him down to the ground. I saw the subject trying to get up from the street, and that's when I shouted out to the subject not to move or he would be shot again.

As I maintained cover on the nude male, other officers went towards the male, recovered the rifle and detained him. I went to the north side of 127 Knoll, and relieved Officer Cabello. I maintained the perimeter in between the two houses by the fence area, while other officers went inside the home. After the situation was cleared I went to stand by my patrol car which had been moved to 121 Knoll by other officers at the scene to let in the ambulances into the scene to recover the injured parties, and take them to the hospital. I then turned off my body camera.