United States District Court
Southern District of Texas

**ENTERED**

July 19, 2024

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| JORGE R. MARTINEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 5:20-CV-75 |
| | § | |
| OFFICER DAVID HINOJOSA, | § | |
| INDIVIDUALLY AND IN HIS | § | |
| OFFICIAL CAPACITY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Before the Court is Defendants' Rule 56 Motion for Summary Judgment and Motion for Judgment on the Pleadings under Rule 12(c). (Dkt. No. 113). Plaintiff responded, (Dkt. No. 119), and the motions are fully briefed. For the reasons set forth below, Defendants' motions are granted.

### I. BACKGROUND

This case arises out of the police shooting of Plaintiff Jorge Martinez. In his live complaint, Plaintiff asserts claims pursuant to 42 U.S.C. § 1983 against the City of Laredo, Texas ("the City") and Officer David Hinojosa ("Officer Hinojosa") of the Laredo Police Department ("LPD"). (Dkt. No. 63). The facts of the case are largely undisputed.

At approximately 5:30 a.m. on November 26, 2019, LPD officers responded to a domestic disturbance on Knoll Avenue in Laredo, Texas. (Dkt. No. 63 at 5).[1] Upon their arrival, Cesar Terrazas ("Terrazas") fired at the officers with an AR-15 assault rifle, and the officers returned fire. (*Ibid.*). At some point during the shootout, Terrazas entered Plaintiff's home and shot Plaintiff's mother in the arm. (*Ibid.*). Plaintiff, his sister, and his wounded mother managed to overpower and disarm Terrazas. (*Ibid.*). While still inside the house, Plaintiff removed the magazine from Terrazas' rifle. (*Ibid.*). Officer

---

[1] Defendants adopted portions of Plaintiff's Fourth Amended Complaint and Jury Demand, (Dkt. No. 63), by reference in their motion for summary judgment, so the Court adopts those facts as undisputed.

Hinojosa did not know Terrazas had entered Plaintiff's home. (Dkt. No. 119-4 at 13).

Shortly after Officer Hinojosa arrived on scene, Terrazas entered Plaintiff's home. (Dkt. No. 63 at 6). Armed with a rifle, Officer Hinojosa concealed himself approximately 100 feet away from Plaintiff's residence behind a tree. (*Ibid.*). A few minutes later, Plaintiff exited the residence with the AR-15 rifle in one hand pointed down. (*Id.* at 5). He quickly walked down his driveway between two parked cars towards the street shouting, "I am not the shooter." (*Id.* at 6). Once Plaintiff arrived at the end of his driveway and entered the street, Officer Hinojosa shot Plaintiff in the abdomen. (*Id.* at 7).

Plaintiff filed his Original Complaint on May 5, 2020, alleging that Defendants were liable under Section 1983 for using excessive force in violation of his Fourth Amendment rights and for violating his Fourteenth Amendment Due Process rights. (Dkt. No. 1 at 7–9). Defendants answered on June 3, 2020, (Dkt. No. 7), and filed their first motion to dismiss on August 7, 2020, (Dkt. No. 21). Plaintiff amended his complaint twice. (Dkt. Nos. 28, 35). On February 22, 2021, Defendants filed an amended motion to dismiss, (Dkt. No. 36), directed to Plaintiff's Second Amended Complaint, (Dkt. No. 35).

On April 15, 2021, the Court granted Defendants' amended motion to dismiss in part. (Dkt. No. 41). The Court dismissed Plaintiff's claims against two individual officers, without leave to amend, (*Id.* at 4–6, 16–17), but granted Plaintiff leave to replead as to Officer Hinojosa and the City, (*Id.* at 6–8). Plaintiff filed his Third Amended Complaint on May 6, 2021. (Dkt. No. 42). Defendants filed their Third Amended Answer several days later, (Dkt. No. 43), and their second amended motion to dismiss on August 2, 2021, (Dkt. No. 47). On March 31, 2022, the Court granted Defendants' second amended motion in part. (Dkt. No. 59). The Court denied Defendants' motion to dismiss Plaintiff's Section 1983 excessive force claim against Officer Hinojosa and granted Plaintiff leave to file an amended complaint solely to replead his policy liability claim against the City. (*Id.* at 24).

On April 22, 2022, Plaintiff filed his Fourth Amended Complaint. (Dkt. No. 63). On February 16, 2024, Defendants filed the motions now before the Court, (Dkt. No. 113).

## II. LEGAL STANDARDS

### A. Summary Judgment Legal Standard

Summary judgment is appropriate when the record establishes "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." FED. R. CIV. P. 56(a). "The moving party bears the initial burden of informing the court of the basis for the motion and of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact or the appropriateness of judgment as a matter of law." *Voelter v. Daimler Trucks N. Am., LLC*, 547 F. Supp. 3d 614, 618 (W.D. Tex. 2021) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the movant meets its burden, the nonmovant "must identify specific evidence in the record and articulate the precise manner in which th[e] evidence raises a genuine dispute of material fact." *Id.* at 619 (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). A fact is material if it "might affect the outcome of the suit under the governing law." *Ibid.* A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ibid.* A genuine dispute will not be satisfied by "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

When considering summary judgment evidence, the Court must view "all facts and inferences . . . in the light most favorable to the nonmoving party." *Ibid.* (quoting *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003)). The Court must "not weigh the evidence or evaluate the credibility of witnesses." *Ibid.* (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)). The Court must "resolve factual controversies in favor of the nonmoving party, but only where there is an actual controversy [i.e.,] . . . when both parties have submitted evidence of contradictory facts." *Ibid.* (quoting *Little*, 37 F.3d at 1075). The Court will not assume, however, "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts, and will grant summary judgment . . . [if] critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Ibid.* (internal quotations omitted).

### B. Judgment on the Pleadings under Rule 12(c) Legal Standard

A party may move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). The standard for a Rule 12(c) motion "is identical to the standard for Rule 12(b)(6)." *Waller v. Hanlon*, 922 F.3d 590, 599 (5th Cir. 2019) (citation omitted). To survive a Rule 12(c) motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Like a Rule 12(b)(6) motion, a Rule 12(c) motion "is viewed with disfavor and is rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citation and internal quotations omitted). Rule 12(c) motions are granted "only if there are no disputed issues of fact and only questions of law remain." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (citations and internal quotations omitted).

When considering a Rule 12(c) motion, the court must "first . . . identify the complaint's well-pleaded factual content" and separate those from "any unsupported legal conclusions." *Waller*, 922 F.3d at 599 (citations and internal quotations omitted); *Iqbal*, 556 U.S. at 663–64. The Court must "accept [ ] all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (citation and internal quotations omitted). However, the Court cannot assume the truth of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. Similarly, the Court cannot "strain to find inferences favorable to the plaintiff [ ]." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citation and internal quotation omitted).

### III. DISCUSSION

Plaintiff brings a claim against Officer Hinojosa, in his individual and official capacity, under 18 U.S.C. § 1983 for use of excessive force in violation of his Fourth Amendment rights. (Dkt. No. 63 at 1). Plaintiff also brings municipal liability claims against the City pursuant to Section 1983. (*Id.* at 13–14). In response, Officer Hinojosa raises the affirmative defense of qualified immunity. (Dkt. No. 113 at 2–9). Additionally, the City asserts that Plaintiff has not properly pleaded his municipal liability claims,

and, thus, those claims should be dismissed under Rule 12(c).[2] (Dkt. No. 113 at 9–13).

### A. Qualified Immunity

The doctrine of qualified immunity "protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Argueta v. Jaradi*, 86 F.4th 1084, 1088 (5th Cir. 2023). The Fifth Circuit Court of Appeals has further explained:

> This immunity protects all but the plainly incompetent or those who knowingly violate the law. Accordingly, we do not deny immunity unless existing precedent places the constitutional question beyond debate.

*Ibid.* (cleaned up).

Courts apply a two-prong analysis to determine whether an officer is entitled to qualified immunity. "An officer merits qualified immunity unless (1) he violated a statutory or constitutional right of the plaintiff and (2) the right was clearly established at the time of the violation." *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022) (citation and internal quotations omitted). "Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable." *Wallace v. Cnty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005) (internal marks omitted). "The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's asserted constitutional or federal statutory right." *Cozzo v. Tangipahoa Parish Council—President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002) (internal marks omitted). Thus, denial of an official's motion for summary judgment predicated upon qualified immunity requires two distinct determinations: (1) "a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law"; and (2) "a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." *Hogan v. Cunningham*, 722 F.3d 725, 730 (5th Cir. 2013) (internal marks omitted).

When a defendant moves for summary judgment based on qualified immunity, the defendant "must be prepared to concede the best view of the facts to the plaintiff."

---

[2] Federal Rule of Civil Procedure 12(c) provides, in pertinent part: "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c).

*Freeman v. Gore,* 483 F.3d 404, 410 (5th Cir. 2007) (quoting *Gonzalez v. Dall. Cnty.*, 249 F.3d 406, 411 (5th Cir. 2001)). A qualified immunity defense alters the usual summary judgment burden of proof. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Ibid.* Despite this, the court must view the evidence in the light most favorable to the nonmovant and draw all inferences in the nonmoving party's favor. *Rosado v. Deters*, 5 F.3d 119, 122–23 (5th Cir. 1993). The court may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). With this framework in mind, the Court evaluates Plaintiff's claims against Officer Hinojosa to determine whether they clear the hurdle of qualified immunity.

### B. Plaintiff's Excessive Force Claim

Plaintiff alleges that Officer Hinojosa violated his Fourth Amendment right to be free from the use of excessive force during a seizure. (Dkt. No. 63 at 13–14). Officer Hinojosa moves for summary judgment on the grounds that Plaintiff's claims are barred by qualified immunity. (Dkt. No. 113 at 2). Specifically, he argues that: (1) there is no evidence he violated Plaintiff's constitutional rights to be free from the use of excessive force, and (2) even if there is a constitutional violation, the constitutional right was not clearly established at the time of the incident. (*Id.* at 2–3). The Court considers each argument in turn.

At the outset, the Court acknowledges that this is a tragic incident for all parties involved. Plaintiff and his family were attacked by Terrazas when he entered their home without warning and began shooting at them with an AR-15 assault rifle. Plaintiff acted valiantly in defending his family by disarming Terrazas. Unfortunately, and unbeknownst to Officer Hinojosa, Plaintiff—not Terrazas—exited the home still in possession of Terrazas' firearm, further aggravating an already tense and tumultuous police confrontation outside the home. There is no question that Officer Hinojosa was acting in his discretionary capacity when he shot Plaintiff. The Court does not fault Plaintiff for acting instinctively in the moments before the regrettable shooting. However, the Court is now faced with considering whether Officer Hinojosa's actions

were objectively reasonable. If they were, Officer Hinojosa did not violate Plaintiff's constitutional rights under the Fourth Amendment.

Initially, "[t]o bring a § 1983 excessive force claim under the Fourth Amendment, a plaintiff must first show that he was seized." *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386 (1989)). "[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Hodge v. Engleman*, 90 F.4th 840, 846 (5th Cir. 2024) (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). Here, this element is undisputed. Officer Hinojosa used deadly force when he shot Plaintiff in the abdomen.

Next, the plaintiff bears the burden of showing: "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (quoting *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999)). Here, Plaintiff has established the first element, as it is indisputable that Plaintiff suffered an injury which resulted directly from Officer Hinojosa's use of force. Rather, the dispute over this claim turns on the last two elements: whether Officer Hinojosa's use of force was clearly excessive and objectively unreasonable.[3]

"Determining whether force was excessive or unreasonable is a necessarily fact-intensive and case-specific inquiry." *Joseph ex rel Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) (footnote and internal quotations omitted). The test for reasonableness "is not capable of precise definition or mechanical application." *Graham*, 490 U.S. at 396 (citation and internal quotations omitted). Whether an officer's use of force was excessive turns on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Rivas-Villegas v. Cortesluna*, 595 U.S., 1, 6 (2021) (per curiam) (quoting *Graham*, 490 U.S. at 396). Courts must judge the reasonableness

---

[3] As the Fifth Circuit has recognized, "[t]hese inquiries are often intertwined." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)).

of use of force "from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citation omitted).

At their core, excessive force claims typically involve an evaluation of the "totality of the circumstances" to determine if the use of force was "objectively unreasonable." *Garza v. Briones*, 943 F.3d 740, 745 (5th Cir. 2019) (citation and internal quotations omitted). The Fifth Circuit has clarified that the "excessive force inquiry is confined to whether the [officer] was in danger at the moment of the threat that resulted in" the use of force. *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 493 (5th Cir. 2001). However, when deadly force is at issue, this inquiry is "constrained." *Ibid.* (quoting *Flores*, 381 F.3d at 399). "It is objectively unreasonable to use deadly force 'unless it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious bodily injury to the officer or others.'" *Flores*, 381 F.3d at 394 (quoting *Garner*, 471 U.S. at 3). The threat cannot be a mere possibility, but rather must be "immediate" to justify the use of deadly force. *Garner,* 471 U.S. at 11.

Evaluating the summary judgment evidence in the context of Officer Hinojosa's qualified immunity defense, the Court must "look at the case from the perspective of a reasonable officer on the scene, paying careful attention to the facts and circumstances of each particular case." *Escobar v. Montee*, 895 F.3d 387, 394 (5th Cir. 2018). The Court must view the facts as Officer Hinojosa perceived them at that moment. Some of the evidence consists of video footage of the incident, including the moment of the shooting, captured on video footage from Officer Hinojosa's body camera and the dashboard camera from a police patrol unit parked near the incident. (*See* Dkt. Nos. 119-1, 119-2). While the video of Plaintiff's abrupt exit from the house leading up to the shooting lasted no longer than 15 seconds, the Court will consider "the facts in the light depicted by the videotape" to the extent they are captured by the recordings. *See Scott v. Harris*, 550 U.S. 372, 381 (2007).

Plaintiff judicially admits to the following facts set forth in Plaintiff's Fourth Amended Complaint, (Dkt. No. 63), which are adopted by Defendants in their motion for summary judgment, (Dkt. No. 113)[4]:

[O]n November 26, 2019, at approximately 5:30 a.m., Defendants - Laredo

---

[4] The Fifth Circuit has long noted that factual statements in pleadings constitute binding judicial

> Police Officers - were called out to a domestic disturbance at the 100 block
> of Knoll Avenue, Laredo, Texas. Upon arrival at the scene, LPD officers
> Eduardo Benavidez and Anthony Cabello were met with a barrage of
> gunfire by Cesar Terrazas, who was shooting an AR-15 style rifle.
>
> Despite being in a heavily populated neighborhood, LPD Officers Eduardo
> Benavidez and Anthony Cabello responded to the shots being fired with a
> barrage of gunfire of their own. […] In all, at least 80 rounds were
> discharged during the altercation.

(Dkt. No. 63 at 5).

When Officer Hinojosa arrived on the scene, he knew shots had been exchanged
with a suspect, and he heard "about three maybe four gunshots." (Dkt. No. 119-4 at 4).
The uncertainty and immediacy of the developing situation is reflected in the video
captured by his body camera as he arrived at the scene to shots being fired by Terrazas.
(Dkt. No. 119-2 at 5:50:58). Officer Hinojosa was unaware of the shooter's identity or his
clothing but was aware someone was shooting towards him and his fellow officers. (Dkt.
No. 119-4 at 4). Officer Hinojosa decided to retrieve his larger weapon from the trunk of
his patrol car because he believed the shots sounded like they were coming from a rifle.
(*Id.* at 5, 20). He testified that he did not know Terrazas's location, nor that Terrazas had
entered Plaintiff's home. (*Id.* at 13). Officer Hinojosa and his field trainee, Officer
Gonzalez, quietly moved in the direction where the shots were coming from. (*Id.* at 7–8,
20). They "went into a kneeling position next to a tree for cover, while [they] scanned the
area [for] the shooter." (*Id.* at 20).

Officer Hinojosa described seeing a nude male exit the house carrying what
appeared to be a rifle and heading towards the driveway. (*Id.* at 16, 23). He stated that
this person was "turning north, and then [turns] south," he saw the weapon move, and
"that is when [he] fired." (*Id.* at 17). Although Plaintiff had removed the magazine and
was attempting to surrender, (Dkt. No. 119 at 17), Officer Hinojosa testified that he saw
a man carrying what appeared to be a rifle in his right hand. (Dkt. No. 119-4 at 22–23).
Officer Hinojosa stated that he believed Plaintiff's firearm "could have come up
immediately," when "he turned around." (*Id.* at 19). After Officer Hinojosa shot Plaintiff,

---

admissions. *See Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001) ("A judicial admission
is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party
making it."); *see also State Farm Fire & Casualty Co. v. Flowers*, 854 F.3d 842, 845 (5th. Cir. 2017).

he testified that the weapon was still around, and he "thought [Plaintiff] was going after the weapon." (Dkt. No. 114 at 73). Officer Hinojosa was unaware that the magazine had been removed from the rifle. (*Id.* at 74). These are the facts as they were known to Officer Hinojosa before the shooting. The Court is constrained to these facts alone.

Plaintiff argues that Officer Hinojosa is not entitled to qualified immunity because Plaintiff did not pose an immediate threat to the officers nor the public at the moment Officer Hinojosa shot him. (Dkt. No. 119 at 7). He claims that he "walked out of his home with one hand raised above his head and the other holding the confiscated weapon with the barrel pointed straight down." (*Id.* at 10). He asserts he declared multiple times that he was "not the shooter." (*Ibid.*). Additionally, Plaintiff argues that "prior to Officer Hinojosa's use of deadly force [Plaintiff] made no aggressive movements, no furtive gestures, and no physical movements which would suggest to a reasonable police officer that he had the will or intent to inflict bodily harm against anyone." (Dkt. No. 119 at 6). Plaintiff references the body camera video to support this argument. (*Ibid.*).

Viewing that body camera video, the Court is unable to ascertain Plaintiff's actions immediately before he is shot. (Dkt. No. 119-2). However, the dash camera video, does show Plaintiff's actions before the shooting. (Dkt. No. 119-1). As Plaintiff walks down the walkway path from his front door, he is seen turning from side to side. (*Id.* at 5:55:55–5:56:00). As he reaches the street, he is either walking quickly or running. (*Id.* at 5:56:00–5:56:05). Once on the street, he is seen turning his body immediately before being shot. (*Id.* at 5:56:05–5:56:08). This is consistent with Officer Hinojosa's testimony that the man carrying the rifle had turned immediately before he shot him. (Dkt. No. 119-4 at 19).

In summary, the patrol unit's dash camera footage shows Plaintiff quickly walking out of his home, briefly pausing at the top of his driveway, swaying around, then quickly moving between two parked vehicles with an object in his hand. (*See* Dkt. No. 119-1 at 5:55:55–5:56:08). Contrary to Plaintiff's narrative which suggests that he walked out of the house calmly and slowly, the video reflects that he was moving in a frantic manner as he traveled from the front yard onto the public street. Plaintiff can be seen in the video moving from side to side and never coming to a complete halt.

In support of the assertion that Officer Hinojosa should have known that he did not pose a threat immediately before firing his weapon, Plaintiff points out that he was

naked when he ran out of his home. (Dkt. No. 119 at 5). He suggests that Officer Hinojosa should have known Plaintiff was not Terrazas given that Terrazas was fully dressed when he entered the home. In their depositions, both of Plaintiff's neighbors, Blanca Hill and Hector Flores, stated that they did not believe Plaintiff was the shooter because Terrazas was dressed in black, and Plaintiff was nude. (*See* Dkt. Nos. 119-5 at 10, 119-7 at 6). Yet, Officer Hinojosa's undisputed testimony is that he did not have any information about the shooter's appearance.

Hill and Flores had both seen the shooter and knew he was a man dressed in black clothing. (*Ibid.*). Since Hinojosa did not have this information, he cannot be expected to use the information in an analysis of whether the person coming out of the home with a rifle in his hand was the suspect. (Dkt. No. 113 at 9). It is plausible that the suspect could have removed his clothing, for whatever reason, during the short interval where the suspect was out of the officers' sight. (*See* Dkt. No. 119-2 at 05:51:50). Ultimately, this is not a situation where the presence or absence of clothing may be relevant to whether an officer could have seen a weapon. All parties agree that the automatic rifle held by Plaintiff was clearly visible. The fact that the person holding the automatic rifle was naked does not support the inference that the person was less of a threat.

Plaintiff emphasizes the fact that he yelled, "I am not the shooter" at least four times as he exited his home to surrender. (Dkt. No. 119 at 14). In support, he proffers his and his neighbors' testimony. (*Ibid.*); (*see also* Dkt. Nos. 119-3, 119-5, 119-7). Mr. Flores testified that he heard Plaintiff shout, "I'm not the shooter," twice before he reached the street and twice after he was shot. (Dkt. No. 119-5 at 7–8). Ms. Hill testified that she also heard Plaintiff shout that statement several times. (Dkt. No. 119–7 at 6). During her deposition, Ms. Hill testified that she had a phone video recording of what transpired that night. (*Id.* at 8–9). Although not included as evidence, Ms. Hill played the recording during the deposition and testified that Plaintiff can be heard shouting "I am not the shooter" at least five times. (*Id.* at 9).

However, Officer Hinojosa testified that he did not hear Plaintiff yell anything at any time prior to the shooting. (Dkt. No. 119-4 at 18). Officer Gonzalez, Officer Hinojosa's field trainee, who was next to Officer Hinojosa at the time of shooting, also testified that he did not hear any shouts either. (Dkt. No. 119-6 at 8). In their motions, Defendants

allege "Officer Hinojosa could not hear or understand what Plaintiff was saying when he exited the residence." (Dkt. No. 113 at 5). Nevertheless, Plaintiff argues that Officer Hinojosa must have heard the shouting because he was in closer proximity to Plaintiff than his neighbor, Mr. Flores. Mr. Flores testified that Officer Hinojosa was three houses down from Plaintiff's house when he fired the shot, while Mr. Flores was "[m]aybe one lot more on [his] longer [ ] side," "not too much further." (Dkt. No. 119-5 at 16). Plaintiff suggests that because Mr. Flores was further away and heard Plaintiff's shouts, Officer Hinojosa must have also heard the same.

But again, evidence of what the neighbors were able to hear and understand is not determinative of what information was known by or available to Officer Hinojosa. He testified that he did not hear Plaintiff yelling "I'm not the shooter." Plaintiff asserts that this is belied by the audio of Officer Hinojosa's body camera video. (Dkt. No. 119-2). The body camera audio contains overlapping sounds—the shots fired by Terrazas as Officer Hinojosa arrived at the scene, Officer Hinojosa cursing and speaking with his fellow officers, the radio chatter of the other officers, Officer Hinojosa's labored breathing as he crouches and runs toward a position, and even the rustling of his clothes and equipment as he moves. (Dkt. No. 119-2 at 5:51:00–5:56:00). There is no discernable audio of Plaintiff shouting "I'm not the shooter." There is some barely audible sound of someone's voice in the distance, but the words are inaudible on the audio of the body camera footage. To the extent Plaintiff asserts that this audio recording reflects what Officer Hinojosa could hear at the time of the shooting, it does not support the conclusion that Officer Hinojosa could clearly hear Plaintiff shouting "I'm not the shooter" before he fired. The Court finds that Officer Hinojosa's testimony about Plaintiff's shouting is uncontroverted by the other summary judgment evidence. Even if Officer Hinojosa could clearly hear and understand what Plaintiff was saying, it would not be unreasonable for him to conclude that the shooter may have been lying to evade the police and continue his shooting spree. (Dkt. No. 119-4 at 4).

An officer's use of force is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," allowing for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary

in a particular situation." *Graham*, 490 U.S. at 396–97. As the Fifth Circuit has held repeatedly, "the excessive-force inquiry is confined to whether the officers or other persons were in danger at the moment of the threat that resulted in the officers' use of deadly force." *Bazan*, 246 F.3d at 493. The focus is on the "act that led [the officer] to discharge his weapon[.]" *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009). Thus, the objective facts "must be filtered through the lens of the officer's perceptions at the time of the incident in question." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). This limits "second-guessing the reasonableness of actions with the benefit of 20/20 hindsight" and "the need for decision-makers to sort through conflicting versions of the actual facts and allows them to focus instead on what the police officer reasonably perceived." *Id.*

Ultimately, officers may justifiably use lethal force if they reasonably believe that the individual is reaching for a gun. *See, e.g.*, *Salazar-Limon v. City of Houston*, 826 F.3d 272, 278–79 (5th Cir. 2016). The Fifth Circuit has adhered to this standard even in cases where officers had not yet seen a gun when they fired, or when no gun was ever found at the scene. *See, e.g.*, *Manis*, 585 F.3d at 844–45; *Reese v. Anderson*, 926 F.2d 494, 500–01 (5th Cir. 1991). Officer Hinojosa knew shots had been fired. He saw a man rushing out of a house with a rifle in his hand. Officer Hinojosa was not required to "wait until a [suspect] turns towards them, with weapon in hand, before applying deadly force to ensure their safety." *Garcia v. Blevins*, 957 F.3d 596, 602 (5th Cir. 2020) (quoting *Salazar-Limon*, 826 F.3d at 279 n.6).

Officer Hinojosa was in a dark neighborhood with a shooter on the loose and did what he reasonably thought was best to keep him and his fellow officers safe. The fact that a naked man exited the residence, while holding a rifle in his hand and yelling something that Officer Hinojosa could not clearly hear, does not mean that Officer Hinojosa should have concluded that it was not Terrazas. Officer Hinojosa's decision to shoot a person who he saw emerging from a house with an automatic rifle in the context of that night's events was sufficiently reasonable to justify the use of deadly force. *Allen v. Hays*, 65 F. 4th 736, 744 (5th Cir. 2023). While "[m]erely having a gun in one's hand does not mean *per se* that one is dangerous," it was the middle of the night, and there was an ongoing active shooting situation. *See e.g.*, *Graves v. Zachary*, 277 F. App'x. 344,

348 (5th Cir. 2008) (emphasis in original).

The Court considers the Fifth Circuit's opinion in *Argueta v. Jaradi* which recently upheld an officer's use of deadly force in a similar context. An officer fatally shot a man armed with a high-capacity handgun after he exited his vehicle and ran toward a vacant lot. *Argueta*, 86 F.4th at 1086. The dash camera footage depicted the suspect running with his right arm pressed against his side. *Id.* at 1087. Much of the disputed issues in that case centered on whether the suspect raised his gun or otherwise made a threatening motion toward the officers to justify the use of deadly force. *Id.* at 1089. Ultimately, the Fifth Circuit determined that whether the suspect raised his gun or made a threatening motion towards the officers was immaterial because he suspiciously concealed his arm in a way that objectively suggested he was armed and dangerous. *Id.* at 1093. The Fifth Circuit held that the furtive gesture justified deadly force. *Ibid.*

The Court only considers the facts "knowable to the defendant officers," and avoids "second guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *White v. Pauly,* 580 U.S. 73, 77 (2017)*; Rybrun v. Huff*, 565 U.S. 469, 477 (2012). Officer Hinojosa did not know he had shot the wrong person until after the fact. However, he knew Terrazas was on the loose, either in Plaintiff's home or its near vicinity. He was aware Terrazas was carrying an AR-15 assault rifle and had opened fire in the neighborhood and at officers. He saw a man rush out of the home, carrying a weapon, and moving rapidly toward the street in the officers' direction. Controlling precedent prohibits the Court from second-guessing Officer Hinojosa's incorrect assumption in the heat of the moment that the man exiting the house with the gun was Terrazas instead of a victim. Although it was a tragic mistake, "[i]f an officer reasonably but mistakenly believes that probable cause exists, he is entitled to qualified immunity." *Club Retro, LLC v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009).

"[T]he Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful conduct." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989) (internal citation omitted). An officer's actions based on a mistaken belief are not necessarily unreasonable and in violation of the Fourth Amendment. For example, in *Hill v. California*, police officers had probable cause to arrest Hill but arrested the wrong man even after he provided identification that he was not the suspect. *Hill v. California*,

401 U.S. 797, 800 (1971). The Court held that the mistaken identity arrest and subsequent search did not violate the Fourth Amendment. *Ibid.* The Court noted that fake identifications were common. *Ibid.* There, the two individuals resembled each other, the mistaken suspect could not explain why he was in the apartment, and the officers had a good faith belief that they were arresting the correct person. *Ibid.* The Court held that although the officers were "quite wrong,"

> [S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us, the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time.

*Id.* at 804. The principle established in *Hill* similarly applies in this case. Even though Officer Hinojosa's decision turned out to be a mistake, there is no Fourth Amendment violation because he believed in good faith that he and his fellow officers faced imminent danger. Relying on that belief, he made a reasonable mistake.

Plaintiff's final argument against summary judgment on Officer Hinojosa's qualified immunity defense is based on Officer Hinojosa's failure to issue a warning or command prior to shooting Plaintiff. (Dkt. No. 119 at 11). Plaintiff argues, "[A]t the time that Officer Hinojosa shot Mr. Martinez, it was clearly established that a warning was required before deadly force can be used, 'where feasible.'" (*Id.* at 13) (quoting *Garner*, 471 at 11–12). Plaintiff argues that "[e]ven though there was more than enough time to have warned [Plaintiff] before using deadly force, Officer Hinojosa chose to shoot first instead." (*Ibid.*). Officer Hinojosa acknowledges that he had "ample opportunity to have issued a command to throw the weapon," but he testified that he did not warn Plaintiff because he did not think Plaintiff would hear him. (Dkt. No. 119-4 at 18, 24).

Officers are required to give a warning before using deadly force if a warning is feasible. *Garner*, 471 U.S. at 11. The critical inquiry is feasibility. *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019). Plaintiff cites to *Cole v. Carson*, and *Baker v. Putnal*, as clearly established law in support of his excessive force claim. While there are similarities in both *Cole* and *Baker*, and the case at hand, there are significant and notable factual distinctions. The only similarities are that the officers shot the suspects without warning. However, the facts leading up to Plaintiff's shooting are distinctly different.

In *Baker*, the case was before the court on a Rule 12(b)(6) motion to dismiss which

the Fifth Circuit determined to have been converted to a motion for summary judgment. *Baker v. Putnal*, 75 F.3d 190, 197–198 (5th Cir. 1996). The Fifth Circuit reversed the trial court's grant of summary judgment because there were disputed fact issues on summary judgment as to whether Baker pointed a gun at the officers or made any threatening action toward the officers. *Ibid.* Likewise, in *Cole v. Carson*, the summary judgment evidence, when viewed in favor of the plaintiff, established that Cole "never made a threatening or provocative gesture towards the officers." 935 F.3d at 449. The police were responding to a report of a person walking in a neighborhood with a handgun. *Id.* at 447– 48. There was no prior or ongoing shootout with police officers. The Fifth Circuit upheld the trial court's finding that a reasonable jury could have found that it was feasible for the officers to give a warning to Cole before opening fire, and therefore the officers' conduct violated clearly established law. *Id.* at 455.

Here, the dash camera of the police cruiser shows Plaintiff moving erratically, twisting his body in a way that caused the arm holding the automatic rifle to move around. (Dkt. No. 119-1). This supports Officer Hinojosa's testimony that he saw the person carrying a rifle—who he believed to be the active shooter—turning and moving the weapon. (Dkt. No. 119-4 at 17). Officer Hinojosa believed that Plaintiff's firearm "could have come up immediately," when "he turned around." (*Id.* at 19). Officer Hinojosa further explained that he did not issue a warning to Plaintiff because he did not think Plaintiff would hear him. (*Id.* at 18, 24).

This was not a scenario where a suspect was standing face-to-face with officers. Plaintiff acknowledges that Officer Hinojosa "was taking cover behind a tree approximately 60 yards away." (Dkt. Nos. 119 at 1–2, 119-4 at 20–21). As discussed *supra*, the body camera audio confirms that Plaintiff's shouts were indistinguishable from Officer Hinojosa's position. The Court finds that the summary judgment evidence supports Officer Hinojosa's reasonable determination that the suspect would not be able to hear any commands he issued. The Court finds that the evidence supports Officer Hinojosa's conclusion that it was not feasible to issue a command before firing. Thus, there is no Fourth Amendment violation.

Because no Fourth Amendment violation was shown, the Court need not proceed with the remainder of the qualified immunity analysis and determine whether Officer

Hinojosa violated clearly established law. However, to be sure, even if the Court were to find that Officer Hinojosa's actions were unreasonable and clearly excessive—and we do not—they do not violate clearly established law. At the summary judgment stage, the Court cannot find that Officer Hinojosa violated Plaintiff's clearly established Fourth Amendment rights by failing to give a warning or instruct Plaintiff to drop the weapon before using deadly force. The facts of this case do not fall squarely within any Supreme Court or Fifth Circuit precedent. However, there are cases from the Fourth and Eleventh Circuit Courts of Appeals that have addressed factual scenarios more similar to the present case.

In the Fourth Circuit opinion of *Milstead v. Kibler*, police officers responded to Milstead's 911 call for help, reporting that he and his fiancée were being attacked by an intruder. *Milstead v. Kibler*, 243 F.3d 157, 160 (4th Cir. 2001), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Officers were aware that a man had been shot in the neck and a woman stabbed. (*Ibid.*). Upon their arrival, they saw fresh blood outside and could hear calls for help inside the home. (*Ibid.*). Following an altercation, Milstead rushed out of the home and an officer shot him believing him to be the assailant. (*Ibid*). The Fourth Circuit explained that "[t]his seizure of the innocent victims implicates the Fourth Amendment, but it is not necessarily unreasonable and therefore in violation of the Fourth Amendment." *Milstead*, 243 F.3d at 164. In affirming summary judgment in favor of a police officer based on qualified immunity, the court in *Milstead* found that "a mistaken understanding of the facts that is reasonable in the circumstance can render a seizure based on that understanding reasonable under the Fourth Amendment." *Id.* at 165.

The Eleventh Circuit faced a similar issue in *Powell v. Snook*. In *Powell*, officers responded to 911 caller reporting her mother had been shot. *Powell v. Snook*, 25 F.4th 912, 916 (2022). The dispatcher was unable to get an exact address and provided officers a rough estimate of where the shots were coming from. *Id.* at 917. Officers inadvertently approached the wrong house. *Ibid.* Hearing the officers' approach and unaware of their identity, homeowner Powell grabbed his own pistol and proceeded outside through his garage door. *Ibid.* Once outside, Powell took ten to fifteen steps at a normal pace and began raising his firearm. *Id.* at 918. The officer fired three shots with his rifle, killing

Powell. *Ibid.* Powell's wife brought a Section 1983 action against the officer, alleging excessive force in violation of the Fourth Amendment. *Id.* at 916. In analyzing the claim, the Eleventh Circuit held that the "law does not require officers in a tense and dangerous situation to wait until a suspect uses a deadly weapon to act to stop the suspect." *Id.* at 922 (quoting *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007)). Further, the Eleventh Circuit "declined to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where such warning might easily have cost the officer his life." *Ibid.* (quoting *Penley v. Eslinger*, 605 F.3d 843, 854 n.6 (11th. Cir. 2010)). The Eleventh Circuit held that an officer in this position, "during the rapidly unfolding events on that dark night reasonably could have believed that the man raising a pistol in his direction was about to shoot him" and the officer could respond with deadly force. *Powell*, 25 F.4th at 924.

The facts in *Powell* more closely mirror the facts before the Court now. Officer Hinojosa arrived on the scene of an active shooter on the loose and saw a man exit a house and hurry down the driveway carrying an automatic rifle and moving around. The man moved into the street in the direction of the officers, twisting around with the firearm in his hand, when Officer Hinojosa shot him. Officer Hinojosa intentionally shot a man he believed had exchanged gunfire with other officers and was still armed and dangerous. While we know in hindsight that Officer Hinojosa mistakenly shot Plaintiff instead of Terrazas, this mistake does not negate the justification for the use of deadly force where Officer Hinojosa had an objectively reasonable belief that Plaintiff was Terrazas and that he believed Terrazas was moving the weapon into a firing position shortly after engaging in a shootout with police. Officer Hinojosa did not have to wait until the suspect—who turned out to be Plaintiff—pointed his automatic rifle at officers to return fire in self-defense. While *Garner* stands for the broad principle that a warning is required before deadly force may be used, it does not mandate it. *See Powell*, 25 F.4th at 923. A warning is only required when it is feasible to do so, and the Court determines that it was not feasible under the facts of this case.

Under the facts presented, the Court cannot second guess Officer Hinojosa's split-second decision because he reasonably feared for his life and the lives of others. Plaintiff has failed to show that Officer Hinojosa shooting Plaintiff under the circumstances was

unreasonable and excessive to overcome qualified immunity. Thus, Plaintiff has not met his burden to show that there is a genuine dispute of material fact. Hinojosa's decision to shoot Plaintiff, while a mistake, was reasonable and not excessive given the totality of the circumstances before him. Furthermore, at the time of the shooting, the law was not clearly established that in this case's context, shooting an armed suspect without giving a warning violated a suspect's federal rights. Importantly, there is no clear and controlling case law, from either the Supreme Court or the Fifth Circuit, that would have put Officer Hinojosa on notice that his use of deadly force without giving a warning, when confronted with a person holding an automatic rifle and rushing out of a house, immediately after a shootout with police, with the whereabouts of the shooting suspect unknown, although mistakenly shooting a victim instead of the suspect, was a clear violation of Plaintiff's Fourth Amendment rights.

### C. Claims Against the City of Laredo

Lastly, the Court turns to Plaintiff's claims against the City of Laredo. Plaintiff asserts three theories of municipal liability under *Monell*: (1) unofficial policy, custom or practice for failure to discipline; (2) unofficial policy, custom or practice for failure to train and/or supervise; and (3) ratification. (Dkt. No. 63 at 8–12); *see Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978). However, when there is no underlying constitutional violation, as explained above, there can be no custom or policy associated with such a violation. *See, e.g., Hall v. Trochessett*, No. 23-40362, 2024 WL 3063109, at \*5 (5th Cir. June 20, 2024) ("[B]ecause there was no constitutional violation by [the officer], there can be no liability against [the city]"; *Garza v. Escobar*, 972 F.3d 721, 734 (5th Cir. 2020) (affirming dismissal of *Monell* claims because plaintiff failed to plausibly allege an underlying constitutional violation); *Cano v. Vickery*, No. CV-H-16-392, 2018 WL 4567169, at \*7 (S.D. Tex. Sept. 24, 2018) (granting city's motion for summary judgment on plaintiff's *Monell* claims where the constitutional claims against the deputy defendants failed as a matter of law ).

Because Plaintiff has not shown a violation of his constitutional rights, his *Monell* claims against the City fail as a matter of law. *See Peterson*, 588 F.3d at 847 (requiring plaintiffs asserting *Monell*-liability claims to show "(1) an official policy (2) promulgated by the municipal policymaker (3) [that was also] the moving force behind the *violation of*

*a constitutional right*") (emphasis added). Accordingly, Defendants' motion for summary judgment on Plaintiff's claims against the City of Laredo is granted.

## IV. CONCLUSION

Based on the foregoing, Defendants' Rule 56 Motion for Summary Judgment and Motion for Judgment on the Pleadings under Rule 12(c), (Dkt. No. 113), is **GRANTED in its entirety**. Plaintiff's claims against Defendants Officer Hinojosa and the City of Laredo, are **DISMISSED WITH PREJUDICE**.

It is so **ORDERED**.

**SIGNED** on July 19, 2024

John A. Kazen
United States District Judge